485 F.2d 1087
 Ray Allen TOLLETT, Appellant,
v.
UNITED STATES of America, Appellee.
 No. 72-1498.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 11, 1973.
Decided Oct. 2, 1973.
 
 Thomas B. Pryor, Fort Smith, Ark., for appellant.
 James Gutensohn, Asst. U. S. Atty., Fort Smith, Ark., for appellee.
 Before LAY, HEANEY and STEPHENSON, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 Section 1718, Title 18, of the United States Code[1] was found by the federal district court to have been violated by the defendant Ray Allen Tollett. Tollett was convicted and sentenced to two years in prison for mailing eight post-cards containing "scurrilous" and "defamatory" language about a former employee and the latter's wife.[2] Tollett testified that he believed a former employee of his, L. A. Clower, had committed numerous malicious acts against him, including poisoning his dog and burning down his place of business. Tollett addressed the postcards to "Burns Sheet Metal," the present employer of Clower. The postcards contained vulgar references about Clower's alleged homosexual conduct and referred to Clower's wife and her alleged activities as a prostitute. Tollett testified that he rationalized Clower would be asked about the postcards and once confronted would be forced to confess his involvement in the malicious acts.
 
 
 2
 On appeal Tollett attacks the constitutionality of the statute on grounds that it violates the First and Fifth Amendments to the United States Constitution.[3] Upon analysis, we conclude that the statute is overly broad and violative of the First Amendment guaranteeing freedom of expression.
 
 
 3
 It is now settled that a person has standing to attack a statute as overly broad if a reasonable construction of the act allows suppression of free speech not-withstanding that the person's own conduct might not be constitutionally protected. This rule is recognized because of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965), quoting NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Without proper restriction such a law "would tend to suppress constitutionally protected rights." Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 873 (1970). To allow standing under such circumstances "is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972). Since this is a departure from traditional rules of standing the doctrine requires that the overbreadth of a statute "must not only be real, but substantial, as well." Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). However, as our discussion reveals, we find Sec. 1718 substantially overbroad.
 
 
 4
 In the instant case the trial court ruled that Sec. 1718 was constitutional. In doing so the district judge observed that the balance of the regulatory power of Congress to regulate the mails was paramount as against the expression of scurrilous and defamatory writings which enjoy no protection under the First Amendment. The trial court, citing Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), found that the defendant's writing contained "no ideas expressed on either of the postal cards with the slightest redeeming social importance or of any interest to the public or other important interest" which enjoys constitutional protection.[4] To avoid confusion, it should be made clear that the defendant was not indicted nor prosecuted for sending lewd or obscene postcards. A separate statute, 18 U.S.C. Sec. 1463, similar to Sec. 1718, punishes the sending of lewd and obscene writings.[5]
 
 
 5
 Prosecutions under Sec. 1718 have been relatively few since its original passage and few convictions have been obtained. Some of the decisions present bizarre facts[6] and in some instances it appears courts have construed the act narrowly to avoid possible conviction. Cf. American Civil Liberties Union v. Kiely, 40 F.2d 451 (2d Cir. 1930); United States v. Higgins, 194 F. 539 (W.D.Ky.1912); United States v. Gee, 45 F. 194 (W.D. Mich.1890). Nevertheless the Act has been given tacit constitutional approval. See McCrossen v. United States, 339 F. 2d 810 (10th Cir. 1965); Cherry v. Postmaster General, 272 F.Supp. 982 (D.P.R. 1967), aff'd without opinion (1st Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1809, 20 L.Ed.2d 653 (1968).
 
 
 6
 The government urges constitutionality of the Act based on a series of cases commencing with Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877 (1877) and including Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092 (1904); McCrossen v. United States, 339 F.2d 810 (10th Cir. 1965); American Civil Liberties Union v. Kiely, 40 F.2d 451 (2d Cir. 1930); Warren v. United States, 183 F. 718 (8th Cir. 1910); Cherry v. Postmaster General, 272 F.Supp. 982 (D.P.R.1967), aff'd without opinion (1st Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1809, 20 L.Ed.2d 653 (1968). The defendant challenges the rationale behind these decisions since they basically rely on the so-called "privilege doctrine." This reasoning is illustrated by the Supreme Court's early observance:
 
 
 7
 "The power possessed by Congress embraces the regulation of the entire postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded." Ex parte Jackson, 96 U.S. 727, 732 (1877).
 
 
 8
 Based on this interpretation the Tenth Circuit observed as recently as 1965 that "the prohibitions contained in that statute [Sec. 1718] must be construed in the light of the regulatory power of Congress rather than in the light of any First Amendment limitation." McCrossen v. United States, 339 F.2d 810, 813 (10th Cir. 1965).
 
 
 9
 The Fifth Circuit recently found in Hiett v. United States, 415 F.2d 664 (5th Cir. 1969), that 18 U.S.C. Sec. 1714-prohibiting the use of the mails to distribute information concerning the obtaining of foreign divorces-violated the First Amendment. In doing so, the court of appeals rejected the implication of McCrossen's "troublesome, atavistic language" and stated that the privilege doctrine was dead. We agree.
 
 
 10
 The supporting authority for the government's regulation of the mails on a "privilege" basis is no longer viable. As the Supreme Court said over 25 years ago in Hannegan v. Esquire, Inc., 327 U.S. 146, 155-156, 66 S.Ct. 456, 461, 90 L.Ed. 586 (1946):
 
 
 11
 "We may assume that Congress has a broad power of classification and need not open second-class mail to publications of all types. The categories of publications entitled to that classification have indeed varied through the years. And the Court held in Ex parte Jackson, 96 U.S. 727 [24 L.Ed. 877], that Congress could constitutionally make it a crime to send fraudulent or obscene material through the mails. But grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever. See the dissents of Mr. Justice Brandeis and Mr. Justice Holmes in Milwaukee Publishing Co. v. Burleson, 255 U.S. 407, 421-423, 430-432, 437-438 [41 S.Ct. 352, 357, 358, 360, 361, 363, 65 L.Ed. 704]." (Our emphasis).[7]
 
 
 12
 In Lamont v. Postmaster General, 381 U.S. 301, 305, 85 S.Ct. 1493, 1495, 14 L.Ed.2d 398 (1965), in striking down Sec. 305(a) of the Postal Service and Federal Employees Salary Act of 1962, 39 U.S.C. Sec. 4008(a), dealing with the Postmaster's right to withhold certain mail, the Supreme Court concluded.
 
 
 13
 "[T]he Act as construed and applied is unconstitutional because it requires an official act (viz., returning the reply card) as a limitation on the unfettered exercise of the addressee's First Amendment rights. As stated by Mr. Justice Holmes in Milwaukee Pub. Co. v. Burleson, 255 U.S. 407, 437 [41 S.Ct. 352, 363, 65 L.Ed. 704] (dissenting): 'The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues. . . ."'
 
 
 14
 See also Blount v. Rizzi, 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971).
 
 
 15
 Adhering to the more recent pronouncements we think it better to reason that the prohibitions of Sec. 1718 must be construed in the light of the First Amendment rather than in the light of any regulatory power granted to the Postal Service.
 
 
 16
 This brings us directly to the discussion of the constitutionality of 18 U.S.C. Sec. 1718.
 
 
 17
 The government urges it is only the mere act of writing on an exposed postcard that renders the card unmailable under Sec. 1718. The argument follows that this does not amount to an abridgement of a First Amendment right since the statute restrains only the "time, manner and place" of speech. Cf. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). See also Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (Cox I); Cox v. Louisiana, 379 U.S. 559, 562, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (Cox II); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); Cox v. New Hampshire, 312 U.S. 569, 575, 61 S.Ct 762, 85 L.Ed. 1049 (1941).
 
 
 18
 We find that the constitutionality of Sec. 1718 cannot be sustained under such a facile test. In Konigsberg v. State Bar, 366 U.S. 36, 50-51, 81 S.Ct. 997, 6 L. Ed.2d 105 (1961), Mr. Justice Harlan observed for a "time, place and manner" test to be applicable the statute (1) must not be intended to control the content of the speech and (2) the statute must be necessary to further a significant government interest.
 
 
 19
 The statute specifically punishes libelous, scurrilous, defamatory and threatening speech. The penal provision is invoked only when the content of the words written on the outside of the envelope are words of this nature. The statute does not bar the writing of all words on the outside of an envelope or postcard. The government asserts that the prohibited language can be safely sealed in an envelope. This fact has little relevancy to the issue at hand. It would be judicial sophistry to deny that the government, under the statute, is in the business of directly censoring the content of the exposed writing. The constitutionality of the statute must be measured in this light and not from the standpoint of merely regulating the form of the communication.[8]
 
 
 20
 It is axiomatic as stated in Police Department v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286,, 2290, 33 L.Ed.2d 212 (1972), that the "First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." However, this statement is not absolute at all times, for as expressed in the oftquoted language of Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942):
 
 
 21
 "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problems. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words-those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."
 
 
 22
 See also Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) and Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).
 
 
 23
 Governmental intrusion into the area of constitutionally protected rights of speech, press and association must be based upon an "overriding and compelling state interest." Gibson v. Legislative Investigation Committee, 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). The Attorney General asserts that the compelling government interests which justify 18 U.S.C. Sec. 1718 are (1) freedom from having offensive materials thrust upon an unwilling viewer and (2) protection of an individual's dignity of reputation. These interests will be discussed separately.
 
 
 24
 The government urges that one of the statutory purposes of Sec. 1718 was "to preserve the integrity of the mails by protecting those exposed to the envelopes, such as postal employees, from having offensive matter 'thrust upon them."' See United States v. Anderson, 268 F. 696 (D.Mont.1920). In Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971), the Supreme Court said:
 
 
 25
 "Finally, in arguments before this Court much has been made of the claim that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwilling listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, e. g., Organization for a Better Austin v. Keefe, 402 U.S. 415 [91 S.Ct. 1575, 29 L.Ed.2d 1] (1971). . . . The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections."
 
 
 26
 In the instant case, it must be presumed that the postal employees' job is to deliver the mail and not to read it. They are in no way forced to read the language on envelopes or postcards other than to determine the addresses. Thus, any concern the government has with protecting the inadvertent viewer is insubstantial. See also Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969).
 
 
 27
 For purposes of our present discussion, we assume it may be said that government, "acting as a guardian of public morality," possesses a compelling interest to protect the dignity of reputation of an individual citizen. We then examine the substantive language of Sec. 1718 to see if this may be accomplished without encroaching into speech which is entitled to First Amendment protection.
 
 
 28
 First, it should be noted that the statute is concerned with any "delineation, epithet, term or language" which is of "libelous, scurrilous, defamatory or threatening character." Thus, the Act appears to be broader than necessary to protect the dignity of reputation of any individual. The scurrilous language found on Cohen's jacket,[9] Papish's scurrilous descriptive epithet in the school paper,[10] and Gooding's scurrilous taunt to the police[11] could each theoretically be punishable under Sec. 1718. Yet we are directed by these authorities that such general application would be unconstitutional. As discussed by the Supreme Court in Cohen:
 
 
 29
 "Against this background, the issue flushed by this case stands out in bold relief. It is whether California can excise, as 'offensive conduct,' one particular scurrilous epithet from the public discourse, either upon the theory of the court below that its use is inherently likely to cause violent reaction or upon a more general assertion that the States, acting as guardians of public morality, may properly remove this offensive word from the public vocabulary.
 
 
 30
 "The rationale of the California court is plainly untenable. At most it reflects an 'undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression.' Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 508 [89 S.Ct. 733, 737, 21 L.Ed.2d 731] (1969)."
 
 
 31
 "How is one to distinguish this from any other offensive word? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." Cohen, supra at 22-23, 25 of 403 U.S., at 1788 of 91 S.Ct. (Our emphasis).
 
 
 32
 Similar concern must govern scurrilous abuse, when directed toward a specific person. Although this moves us closer to our discussion of criminal libel, scurrilous personal abuse can under varied facts easily fall short of actual defamation. Scurrilous language may contain words of "low indecency or abuse" but it may also connotate words which are "characterized by low buffoonery" or "coarsely jocular." Webster's Third New International Dictionary Unabridged 2044 (1966). Some persons might be offended by being called a "bum" or an "S.O.B." yet others might consider the source of the insult and laugh it off. It is highly doubtful that the government has much of a legitimate interest in punishment of "name calling" between private parties.
 
 
 33
 In light of Cohen, supra, it is doubtful whether the Attorney General's concern with protecting the public from scurrilous (i. e., offensive) words is a compelling enough interest to justify Sec. 1718's restriction on all scurrilous speech. As the court noted in Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971): "Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability." (Our emphasis). It is improbable that most scurrilous or offensive speech, even though directed at a specific person, will result in anything more than public inconvenience, annoyance or unrest. As such we conclude there is not presented a serious enough substantive evil to justify such a broad governmental regulation. See also Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 1949).[12]
 
 
 34
 We move next to a discussion concerning the "libelous" and "defamatory" statements proscribed under Sec. 1718.
 
 
 35
 We would serve little purpose by discussing the ignominious history of the law surrounding criminal libel.[13] Most states still maintain some type of statute punishing criminal libel; however, commentators acknowledge that prosecutions under them are extremely rare. See, e. g., T. Emerson, The System of Freedom of Expression 543 (1970). Although the case has been subjected to great criticism, a state's power to punish group libel was narrowly upheld by the Supreme Court in Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952).[14]
 
 
 36
 However, with regard to issues of public concern[15] and individuals of public notoriety[16] the state's power to punish libel has been strictly narrowed.[17] In fact, with the advent of Garrison and Ashton, a strong argument may be made that there remains little constitutional vitality to criminal libel laws.[18]
 
 
 37
 Consideration of the present need for penal provisions in the area of libel and defamation must be focused here on the fact of federal regulation, rather than state action. In order to receive federal cognizance, there must exist some reasonable nexus with the "protection" of interstate commerce-in this case the federal concern over the mails. History amply demonstrates that criminal defamation is either predicated on "the public right to tranquility" or "the private right to enjoy integrity of reputation." Beauharnais v. Illinois, 343 U.S. 250, 294, 72 S.Ct. 725, 750, 96 L.Ed. 919 (1952) (Jackson, J.) (dissenting opinion). See also Kelly, Criminal Libel and Free Speech, 6 Kan. L.Rev. 295, 296, 319-320 (1958).
 
 
 38
 The traditional justification for criminal libel laws has been the avoidance of public disorders and breaches of peace. Beauharnais, supra at 254 n. 3, 72 S.Ct. 725; Kelly, supra at 319. However, as echoed by Mr. Justice Brennan, "'it can hardly be urged that the maintenance of peace requires a criminal prosecution for private defamation."' Garrison, supra at 69 of 379 U.S., at 213 of 85 S.Ct., quoting Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 924 (1963).
 
 
 39
 In Beauharnais, supra at 266 of 343 U.S., at 735 of 72 S.Ct., Mr. Justice Frankfurter speaking for the majority observed:
 
 
 40
 "Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase 'clear and present danger.' Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of such circumstances. Libel, as we have seen, is in the same class."
 
 
 41
 See also Berney, Libel and the First Amendment-A New Constitutional Privilege, 51 Va.L.Rev. 1, 40 (1965); Note, Constitutionality of the Law of Criminal Libel, 52 Col.L.Rev. 521, 525-526 (1952).
 
 
 42
 Mr. Justice Powell in his dissent in Rosenfeld v. New Jersey, 408 U.S. 901, 905, 92 S.Ct. 2479, 2481, 33 L.Ed.2d 321 (1972), relates that Chaplinsky "is not limited to words whose mere utterance entails a high probability of an outbreak of physical violence." In Cantwell v. Connecticut, 310 U.S. 296, 309, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940), where the conviction was reversed because of the peaceful manner of communication, the Court emphasized that the abusive language was not "directed to the person of the hearer." See also Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) and Mr. Justice Black's dissent in Beauharnais, supra at 273 of 343 U.S., 72 S.Ct. 725. Of course a printed defamatory statement sent through the mails and not made face-to-face lends itself only to the remotest concern of persons resorting to violence "in defense of their honor." In view of this background, one could easily agree with Professor Emerson that libel in its present form "no longer serves these functions." T. Emerson, The System of Freedom of Expression 518 (1970). See also Garrison v. Louisiana, 379 U.S. 64, 70, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).
 
 
 43
 Thus, we conclude the only tenable basis upon which the government might justify a criminal libel act such as Sec. 1718 must relate to the claim that it serves as a supplement to the civil libel laws to protect the dignity of reputation of the individual. However, we think this, too is a weak and questionable basis for governmental intrusion into the delicate area of regulating expression.[19] For the true danger flows not from the governmental proscription of "bad" language but from the damage to First Amendment freedoms in deterring the free exchange of the "good." Self-censorship through fear of criminal punishment can diminish the boundaries of original thought and expression of utilitarian emotions[20] and ideas.[21]
 
 
 44
 However, assuming that the protection of reputation serves as a compelling governmental interest to apply criminal sanctions, we resolve the challenge to the Act on a different ground. We hold that the provision of Sec. 1718 which attempts to prosecute libelous and defamatory statements is void as being vague and overly broad.[22]
 
 
 45
 Notwithstanding a construction by the highest court in Kentucky that its criminal libel statute was not in any way related to breaches of peace, the Supreme Court of the United States, in Ashton v. Kentucky, 384 U.S. 195, 86 S. Ct. 1407, 16 L.Ed.2d 469 (1966), did not merely set aside the conviction on the basis of the trial court's erroneous charge which had incorporated the "breach of peace" test. Instead, the Supreme Court held the Kentucky statute unconstitutionally vague and overbroad. Mr. Justice Douglas speaking for the Court observed:
 
 
 46
 "We agree with the dissenters in the Court of Appeals who stated that '. . . since the English common law of criminal libel is inconsistent with constitutional provisions, and since no Kentucky case has redefined the crime in understandable terms, and since the law must be made on a case to case basis, the elements of the crime are so indefinite and uncertain that it should not be enforced as a penal offense in Kentucky.'
 
 
 
 * * *
 "Here, as in the cases discussed above, we deal with First Amendment rights. Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer. We said in Cantwell v. Connecticut, supra, that such a law must be 'narrowly drawn to prevent the supposed evil,' 310 U.S., at 307 [60 S.Ct. at 905], and that a conviction for an utterance 'based on a common law concept of the most general and undefined nature,' id., at 308 [60 S.Ct. at 905], could not stand." Ashton, supra at 198, 200-201, 86 S.Ct. at 1410-1411.
 We conclude that Sec. 1718, as it relates to libelous and defamatory statements,[23] is similarly unconstitutional because of its substantial overbreadth: The Act does not in any way attempt an objective definition of "libelous" and "defamatory";[24] there exists no statutory language limiting the application of the present penal statute to private libel in contrast to libel relating to public officials, public figures or public affairs;[25] there is no clarification within the statute as to whether Congress intended truth to be a defense to any defamation[26] or, if so whether truth would still be punishable unless coupled with good motives;[27] there is no clarification in the Act as to whether Congress deemed it necessary that "malice" be an element of the offense for either private or public libels;[28] there is no clarification as to whether libel must be knowingly falsely made or may be "negligently" made;[29] there is no clarification as to whether the libelous or defamatory statements must necessarily lead to an immediate breach of peace[30] and, if so, there is no narrow approach as to the meaning of "breach of peace" encompassed by the statute. Cf. Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).
 As a federal court construing a federal act we can only borrow from state construction. In doing this, we are left to a maze of common law approaches to the term defamation-any number of which are as vague and unconstitutional as those found in the Kentucky and Louisiana statutes. If possible, the statute should, of course, be construed as constitutional. Nevertheless, the Supreme Court has observed: "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose. . . ." Shelton v. Tucker, 364 U.S. 479, 488-489, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (footnotes omitted). This is especially true when the statute involved is criminal in nature. As Justice Brennan admonished in NAACP v. Button, 371 U.S. 415, 432-433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963):
 "The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. Cf. Marcus v. Search Warrant, 367 U.S. 717, 733 [81 S.Ct. 1708, 1717, 6 L.Ed.2d 1127]. These freedoms are delicate and vulnerable, as well as supremely precious in our society. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. Cantwell v. Connecticut, 310 U.S. 296, 311 [60 S.Ct. 900, 906, 84 L.Ed. 1213]."
 An argument might be made that Sec. 1718 could be narrowly construed by a federal court and therefore it will be constructed as so interpreted. Even if this were true, Tollett's conviction could not stand, since there is no indication how the trial court construed the statute. Cf. Time, Inc. v. Hill, 385 U.S. 374, 397, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). We conclude under existing cases, however, where similar argument has been made, that without limiting legislative terms the statute must be declared void for substantial overbreadth. It is not the judiciary's job to rewrite it. And, furthermore, we are not confident that our construction could meet all constitutional challenges which might possibly arise in future cases. And, as evidenced by our discussion, we are at a loss to suggest how to uniformly define what expressions should or should not be punishable under the Act. Section 1718 is unconstitutionally overbroad because, as was stated so succinctly in Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1939), it sweeps within it "a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application."
 In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), it was said that when "no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution," then "those affected by a statute are entitled to be free of the burdens of defending prosecutions, however expeditious, aimed at hammering out the structure of the statute piecemeal . . .." Dombrowski, supra at 491, 85 S.Ct. at 1123. See also Garner v. Board of Public Works, 341 U.S. 716, 727, 71 S.Ct. 909, 95 L.Ed. 1317 (1951) (concurring and dissenting opinion); cf. Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).
 Judgment reversed and the cause remanded with directions to vacate the judgment of conviction in accordance with this opinion.
 
 
 [1]
 The statute reads:
 "All matters otherwise mailable by law, upon the envelope or outside cover or wrapper of which, or any postal card upon which is written or printed or otherwise impressed or apparent any delineation, epithet, term, or language of libelous, scurrilous, defamatory, or threatening character, or calculated by the terms or manner or style of display and obviously intended to reflect injuriously upon the character or conduct of another, is nonmailable matter, and shall not be conveyed in the mails nor delivered from any post office nor by any letter carrier, and shall be withdrawn from the mails under such regulations as the Postal Service shall prescribe." 18 U.S.C. Sec. 1718 (1948).
 
 
 [2]
 Tollet was originally convicted and placed on probation. On appeal this conviction was set aside on the ground that Tollett had not been constitutionally afforded right of counsel. Tollett v. United States, 444 F.2d 622 (8th Cir. 1971)
 
 
 [3]
 Tollett's able counsel also challenges the sufficiency of the evidence to support the trial court's finding that Tollett was mentally competent when he mailed the postcards. In reviewing the conflicting evidence presented at the trial concerning defendant's mental state we cannot say that the trial court's ruling finding Tollett mentally competent was clear error. See Bradley v. United States, 447 F.2d 264 (8th Cir. 1971), vacated as moot, 404 U.S. 567, 92 S.Ct. 746, 30 L.Ed.2d 722 (1972)
 
 
 [4]
 The trial court's opinion was written, of course, before the Supreme Court modified the Roth obscenity test in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)
 
 
 [5]
 Both statutes (Sec. 1463 and Sec. 1718) are derived from the same legislation. 17 Stat. 302, Sec. 148 (1872)
 In 1948 the provision relating to mailing indecent and obscene matter was separated and incorporated into the chapter of the United States Code dealing with "obscenity," and became 18 U.S.C. Sec. 1463, 62 Stat. 782 (1948), leaving Sec. 1718 in its present form.
 
 
 [6]
 In Stevens v. Summerfeld, 151 F.Supp. 343, 344 (D.D.C.1957), aff'd, 103 U.S.App.D.C. 201, 257 F.2d 205 (1958), writing on the outside of an envelope was said to reflect injuriously on the character of the Postmaster General because it attacked the legend "In God We Trust" printed on a postage stamp. The defendant wrote that the stamp was "in open and willful contempt of the constitutional laws of the United States of America . . . and was an unlawful act of assistance to religion per se." In Shoemaker v. Burke, 67 App.D.C. 281, 92 F.2d 205 (1937), the words "I don't read Hearst" exposed on an envelope were said to condemn "the character and conduct of Hearst." In United States v. Davis, 38 F. 326, 327 (W.D.Tenn. 1889), the defendant was found guilty under the act for writing on a postcard, inter alia, "tell that Radical to send my book back as he agreed." Many of the early decisions under the Act held attempts to collect debts or the disclosure of a collection agency's name on the envelope to be in contravention of the Act. See United States v. Brown, 43 F. 135 (D.Vt.1890); United States v. Burnell, 75 F. 824 (S.D.Iowa 1896); United States v. Dodge, 70 F. 235 (E.D.Pa.1895); United States v. Smith, 69 F. 971 (D.Minn.1895); United States v. Simmons, 61 F. 640 (D. Conn.1894); but see In re Barber, 75 F. 980 (E.D.Wis.1896)
 
 
 [7]
 Mr. Justice Harlan's opinion in Roth v. United States, 354 U.S. 476, 504 n. 5, 77 S. Ct. 1304, 1319, 1 L.Ed.2d 1498 (1957), contained the following footnote:
 "The hoary dogma of Ex parte Jackson, 96 U.S. 727 [24 L.Ed. 877], and Public Clearing House v. Coyne, 194 U.S. 497 [24 S.Ct. 789, 48 L.Ed. 1092], that the use of the mails is a privilege on which the Government may impose such conditions as it chooses, has long since evaporated. See Brandeis, J., dissenting, in Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 430-433 [41 S.Ct. 352, 360-361, 65 L.Ed. 704]; Holmes, J., dissenting, in Leach v. Carlile, 258 U.S. 138, 140 [42 S.Ct. 227, 228, 66 L.Ed. 511]; Cates v. Haderlein, 342 U.S. 804 [72 S.Ct. 47, 96 L.Ed. 609], reversing [7 Cir.] 189 F.2d 369; Door v. Donaldson, 90 U.S.App.D.C. 188, 195 F.2d F.2d 764."
 Such cavalier rejection for the "privilege" precedents was earlier predicted by Professor Chafee in 1 Z. Chafee, Jr., Government and Mass Communication 277-279 (1947).
 
 
 [8]
 However, even assuming Sec. 1718 is not intended to regulate the content of speech and that the government has a legitimate end and substantial interest in prohibiting certain exposed expressions in the mails "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). Thus even though the power to regulate the time, manner and place of distribution is not doubted, the regulation must be narrowly tailored to meet the supposed evil. See Louisiana v. NAACP, 366 U.S. 293, 297, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). As will be discussed, infra, Sec. 1718 is not such a narrowly drawn statute
 
 
 [9]
 Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)
 
 
 [10]
 Papish v. Board of Curators, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973)
 
 
 [11]
 Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)
 
 
 [12]
 The Attorney General cites the case of Rowan v. Post Office, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), wherein the Court sustained a federal statute allowing an individual to direct that the Postmaster remove his name from unwanted mailing lists
 However, the Court emphasized that it was the individual who was censoring his own mail with the government playing only a ministerial role. The Court observed:
 "Both the absoluteness of the citizen's right under Sec. 4009 and its finality are essential; what may not be provocative to one person may well be to another. In operative effect the power of the house-holder under the statute is unlimited; he may prohibit the mailing of a dry goods catalog because he objects to the contents -or indeed the text of the language touting the merchandise. Congress provided this sweeping power not only to protect privacy but to avoid possible constitutional questions that might arise from vesting the power to make any discretionary evaluation of the material in a governmental official." Rowan v. Post Office, supra at 737, 90 S.Ct. at 1491. (Our emphasis).
 This is a far cry from Sec. 1718's criminal sanctions imposed for sending what a Postmaster or United States Attorney believes to be scurrilous mail.
 
 
 [13]
 For a full discussion of the history of criminal libel laws see, e. g., Kelly, Criminal Libel and Free Speech, 6 Kan.L.Rev. 295 (1958); Note, Constitutionality of the Law of Criminal Libel, 52 Col.L.Rev. 521 (1952). See also the historical development set forth in Garrison v. Louisiana, 379 U.S. 64, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Beauharnais v. Illinois, 343 U.S. 250 (1952); Ashton v. Commonwealth, 405 S.W.2d 562 (Ky.), rev'd sub nom. Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966)
 
 
 [14]
 This was a 5-4 decision, and in view of more recent decisions it is extremely doubtful that the Illinois statute then existing would be upheld today. See Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed. 2d 469 (1966). As Professor Emerson has observed:
 "The major premise of Beauharnais- that libel laws are not within the coverage of the First Amendment-was overruled by New York Times v. Sullivan in 1964. A minor premise-that criminal libel laws are outside the First Amendment-was expressly repudiated a few months later in Garrison v. Louisiana. Hence little remains of the doctrinal structure of Beauharnais." T. Emerson, The System of Freedom of Expression 396 (1970).
 Dissenting in Beauharnais, supra at 298, 72 S.Ct. at 751, Mr. Justice Jackson noted that:
 "It is a matter of notoriety that the press often has provoked hostility, that editors have been mobbed and horsewhipped, but criminal libel prosecutions have not been frequent and, as safeguarded by state law, they have been so innocuous that chronicles of American journalism give them only passing mention."
 
 
 [15]
 See Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)
 
 
 [16]
 See Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)
 
 
 [17]
 See also Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966)
 
 
 [18]
 Mr. Justice Brennan's observation in Garrison v. Louisiana, 379 U.S. 64, 69-70, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964), lends reasonable support to this thinking. He observed, reflecting the thinking of the ALI Reporters in the Proposed Official Draft of the Model Penal Code of the American Law Institute:
 "'It goes without saying that penal sanctions cannot be justified merely by the fact that defamation is evil or damaging to a person in ways that entitle him to maintain a civil suit. Usually we reserve the criminal law for harmful behavior which exceptionally disturbs the community's sense of security. . . . It seems evident that personal calumny falls in neither of these classes in the U. S. A., that it is therefore inappropriate for penal control, and that this probably accounts for the paucity of prosecutions and the near desuetude of private criminal libel legislation in this country. . . .' Model Penal Code, Tent.Draft No. 13, 1961, Sec. 250.7, Comments, at 44."
 
 
 [19]
 Professor Emerson observes:
 "To the extent the libel laws afford damages for injury to reputation that affects one's standing in the community and hence one's role as decision maker, the problem is somewhat different. But here too the original balance in favor of expression would seem entirely proper. The very essence of a system of free expression is that the participants are the ones who judge standing, prestige, the weight to be accorded a particular speaker, and all similar matters. These issues are to be fought out in the public forum, not decided by government authorities. The attempt to inject the government into such issues through the libel laws should be struck down as opposed to the fundamental nature of the system.
 "This brings us to the third function of the libel laws, which is to protect against injury to a person's feelings. . . . [A] civil action for damages in this situation would have a minimal effect upon the operation of a system of free expression. The government's role is primarily that of umpire, with no interest of its own at stake." T. Emerson, The System of Freedom of Expression 543 (1970) (Our emphasis).
 
 
 [20]
 As Mr. Justice Harlan so realistically commented:
 "In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated." Cohen v. California, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).
 
 
 [21]
 The same has been said about unguarded censorship under obscenity statutes. Luros v. United States, 389 F.2d 200, 206 (8th Cir. 1968)
 
 
 [22]
 Vagueness in one sense is designed to prevent one from being convicted under a statute which is not "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S. Ct. 126, 127, 70 L.Ed. 322 (1926). However, Mr. Justice Marshall wrote in Grayned v. Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972), "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." He went on to observe that the pivotal consideration is whether one can determine "what the ordinance as a whole prohibits." And as Chief Justice Vinson observed in Communications Association v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950):
 "The argument as to vagueness stresses the breadth of such terms as 'affiliated,' 'supports' and 'illegal or unconstitutional methods.' There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question. The applicable standard, however, is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. That particular context is all important."
 See also Hunter v. Allen, 422 F.2d 1158, 1168 (5th Cir. 1970), rev'd on other grounds, 401 U.S. 989, 91 S.Ct. 1237, 28 L.Ed.2d 528 (1971).
 We use "vagueness," however, in the sense that it is "wholly merged with the overbreadth doctrine when statutes covering first amendment activities are at issue." Note, The First Amendment Overbreadth Doctrine, 83 Harv.L. Rev. 844, 873 (1970). As we discuss vagueness we limit it to the approach Mr. Justice Goldberg took in Cox v. Louisiana, 379 U.S. 536, 551, 85 S.Ct. 453, 462, 13 L.Ed.2d 471 (1965)-namely "[t]he statute . . . is unconstitutionally vague in its overly broad scope." See also Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).
 
 
 [23]
 The government urges that Sec. 1718 proscribed "threatening" language as well, and as such could be applicable to Tollett's postcards. Tollett was not charged with writing "threatening" postcards. However, under the statute the word "threatening" can enjoy no better treatment than the other words which possess uncertain meaning. For example, does the statute mean the threat of physical violence or the possibility of taking legal action? Some early decisions have held that the mere threat of legal action was encompassed within the statute's terms. See, e. g., United States v. Prendergast, 237 F. 410 (D.Or.1916); United States v. Simmons, 61 F. 640 (D.Conn.1894); contra, United States v. Elliott, 51 F. 807 (D.Ky. 1892). Is it possible today that a person could be jailed for writing on a postcard that "[s]uit enters unless you act promptly"? Prendergast, supra at 410 of 237 F
 
 
 [24]
 The Louisiana statute struck down in Garrison specifically defined defamation. Garrison v. Louisiana, 379 U.S. 64, 65, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)
 
 
 [25]
 See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)
 
 
 [26]
 In the instant case, Tollett testified that his statements were true; no testimony contradicted his evidence. While some of his statements were obviously fantasy, others could have had factual basis. Cf. United States v. Keller, 158 F.Supp. 940 (M.D.Pa.), rev'd, 259 F.2d 54 (3d Cir. 1958). The trial court simply found Tollett guilty, without evaluation, on the basis that he admitted sending the postcards
 
 
 [27]
 Indeed, in Cherry v. Postmaster General, 272 F.Supp. 982 (D.P.R.1967), aff'd without opinion, (1st Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1809, 20 L.Ed.2d 653 (1968), the district court specifically held that since libelous statements were not protected by the First Amendment, truth was irrelevant in a prosecution under Sec. 1718
 The Cherry case serves to demonstrate the uncertainty of the intended meaning of the language within the Act. The holding seems somewhat anomalous in view of the overall history of state criminal libel laws adopted subsequent to the First Amendment, which generally have recognized truth as a defense. Ironically, even the ill-famed Sedition Act of 1798 recognized truth as a defense. Under the Louisiana statute struck down in Garrison, however, truth was not a defense. In some states truth is not a defense unless the statement is made with "good motives and for justifiable ends." See, e. g., N.Y.Const. art. I, Sec. 8; N.Y.Pen.Law, McKinney's Consol. Laws, c. 40, Sec. 1342. Whether libel was true or false was irrelevant under English common law. This was because breach of peace was regarded as the gist of the crime. As was said in the early English case, "[e]very libel . . . is made either against a private man, or against a magistrate or public person. If it be a private man it deserves a severe punishment, for although the libel be made against one, yet it incites all those of the same family, kindred or society to revenge, and so tends per consequens to quarrels and breach of the peace, and may be the cause of shedding of blood, and of great inconvenience . . . ." DeLibellis Famosis, 5 Co.Rep. 125a, 77 Eng.Rep. 250, 251 (1606). From this history came the saying "the greater the truth the greater the libel." It was not until the passage of Lord Campbell's Act in 1842 that evidence of truth became admissible in English libel trials. However, as truth became an acceptable defense in this country, "breach of peace" naturally lost credence as a foundation upon which to support the crime. For an excellent discussion of this history, see Note, Constitutionality of the Law of Criminal Libel, 52 Col.L.Rev. 521 (1952).
 
 
 [28]
 At common law mere publication was proof of malice. R. Perkins, Criminal Law 417 (2d ed. 1969). The requirement of actual malice established in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), was said by Mr. Justice Brennan to apply only to public libels. Garrison v. Louisiana, 379 U.S. 64, 72 n. 8, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Whether this same limitation should apply to criminal libel, even though relating to private matters, is, of course, not made clear by Sec. 1718
 
 
 [29]
 See Garrison v. Louisiana, 379 U.S. 64, 79, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)
 
 
 [30]
 See Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). It is likely that at the time Congress enacted the original statute, 18 U.S.C. Sec. 355 (Act of March 4, 1909, ch. 321, Sec. 212, 35 Stat. 1129), it intended, as well, to punish libelous expression for fear of public disruption, since this was still the traditional and historical basis for criminal libel laws. See Kelly, Criminal Libel and Free Speech, 6 Kan.L.Rev. 295, 319 (1958)