UNITED STATES v. BURNELL.

(District Court, S. D. Iowa, C. D. July 21, 1896.)

No. 1,240.

1. USE OF MAILS—DEFAMATORY MATTER.

A paper issued by a collection agency contained on its first page a motto showing that its purpose was to collect debts, and a large part of the paper contained notices warning the public against persons alleged to have failed to pay their debts, or asking for information as to such persons.

It appeared that, when an account was sent to the agency for collection, the alleged debtor was notified that, if not paid, the account would be advertised in such paper as being for sale, and the paper contained many such advertisements. *Held* that, the object appearing to coerce payment of money, the notices published were "calculated by the terms * * * and obviously intended to reflect injuriously upon the character or conduct of another," within the meaning of Act Sept. 26, 1888.

2. SAME—OUTSIDE COVER OF PAPER.
   When the outside pages of a publication, though of the same color as the rest of the publication, overspread or overlay the publication, such pages may be considered the "outside cover," of the publication, within Act Sept. 26, 1888.

Charles D. Fullen, U. S. Atty.
S. S. Etheridge, for defendant.

WOOLSON, District Judge. The defendant was indicted under Act Sept. 26, 1888 (25 Stat. 496; 1 Supp. Rev. St. 621), charged with having knowingly caused to be deposited in the United States post office at Marshalltown, Iowa, for mailing and delivering through the United States post-office establishment, "a certain newspaper, pamphlet, and publication, called the 'Interstate Tracer' [which is particularly described], upon the outside cover and wrapper of which language of a scurrilous and defamatory character was printed," etc. The cause was tried to a jury on a plea of not guilty, and verdict of guilty returned. The present hearing is on motion in arrest of judgment. The decision of this motion turns on the construction of the term "outside cover." The evidence was uncontradicted in all matters of fact. As stated on its second page of the number introduced in evidence, the Interstate Tracer is published weekly "by A. S. Burnell, secretary of the State Business Men's Association of Iowa." The same page announces that "all correspondence should be addressed to A. S. Burnell, state secretary and manager, editor." This weekly publication consists of 16 pages. It is shown that these pages are printed on one sheet of paper, which is then folded into the 16 pages, constituting—when the paper is sewed or bound together with staples, and proper trimming of edges has been made—the paper as it is sent through the mails. At the top of the outside (front) page appears the title, the date, number of current issue, and number of volume, and the motto, "'Do unto others as you would have them do unto you,' as we trace up your record, and make your deeds known." Upon this front (outside) page, under headings (printed in large, full-faced type) of "Wanted" and "Warning," appear various notices or paragraphs. Among the notices appear the following (the name of the place, at beginning of notice, being in full, heavy-faced type):

ARMSTRONG, IOWA. Will you please advertise for J. C. C. ———, who was in the livery business at Armstrong, Iowa, and skipped out and left his bills unpaid, and should be rated all H's. Advise merchants wherever he may be to require cash on delivery.

PEORIA, ILL. Please find for me Wm. B——y, who we think has left the city, owing us a large amount. Also warn all merchants where he is not to trust him. He is full of promises, and a smooth talker. Also locate for me Mr. Wm. B——h. We think he is in Springfield, but his family is in Peoria; and we also warn Peoria merchants not to trust him.

LE MARS, IOWA. Mrs. Minnie ———, or Mrs. Frank ———, of Webster City, Iowa, has moved to Le Mars, Ia., for a short time only. Her home is here. She is no better pay than her husband, who has left her for parts unknown. If she treats others as she treated us, she is worthy of all the H's she gets. Her promises are unsatisfactory, because she does not aim to keep them.

The names of the persons to which "warning," etc., is directed are given in full in the said paper, but, for obvious reasons, I have not given them in full in these extracts. In some of the inner pages, scattered among other notices, and under similar headings, of "Wanted" and "Warning," appear other notices, as to other parties and localities, of same general character as above. Though not bearing on this hearing, it may be due the defendant that the further statement be made that some of the notices printed in the paper are notices of a complimentary character, with regard to prompt payment of debts by the persons named in them.

Counsel for defendant resists the claim of the government that the notices above quoted fall within the inhibition of the statute, as being "calculated by the terms or manner of display and obviously intended to reflect injuriously upon the character or conduct of another." This resistance was founded on claim by defendant as to the object of the paper. Stated more fully, defendant claimed that the publication of the paper was primarily designed to protect retail merchants from persons who would not pay their debts, and that these notices of "warning" and "wanted" were inserted for that purpose. This claim is not without force. But the motto of the paper, above quoted, shows the design to be rather "debt-collecting" than "debt-preventing." The methods employed by the defendant corroborate the suggestion just made. While these methods were not introduced in evidence on the trial, they were submitted in connection with the arguments on the pending motion. The typewritten brief or statement presented by the defendant in person, and the certificates or statements signed by patrons of the paper in different localities, all of which were submitted on behalf of defendant on the hearing of the motion, make proper the consideration of the methods employed, as bearing on what was intended by publication of the notices above quoted. When an account was sent in to the Interstate Tracer management for collection, the first step towards collection was by notification, sent by letter, to the alleged debtor, stating the amount of the debt, and to whom incurred, and notice that unless the settlement of such debt was made within the time therein named the debt would be advertised in the Tracer as for sale; that, further, the Tracer manager would print the account, and an offer for sale of same, in handbills, which would be posted up in the post office at which the debtor obtained his mail, and also posted on the different billboards and other public places in the place of his residence. And a specimen copy of such handbill would be inclosed or forwarded with the letter of notification, also specimen copy of the Interstate Tracer. In the copy of the Tracer in evidence appear a number of columns of such accounts as offered for sale. The scheme thus evidenced bears marked similarity in many points to those employed by what are generally known as "dead-beat" or

"uniform" collection agencies, and suggests very forcibly that the Tracer manager has so modeled his scheme as, in his judgment, to run as closely in the channel of "dead-beat" agencies as he believed possible, without rendering the Tracer unmailable under the statute. That the object of the scheme, including the Tracer, was to coerce payment of money, cannot be doubted. The expectation underlying this effort at "collection" unquestionably was that, rather than be thus exposed to the humiliation, and even ignominy, of having his account posted for sale in his home town, and advertised in the Tracer, with perhaps a notice of "warning" similar in its defamatory character, or injurious reflection on character and conduct, to those quoted, the alleged debtor would pay the debt claimed due from him. Using the phraseology of Judge Butler in U. S. v. Dodge, 70 Fed. 235, 236, defendant's purpose was to "coerce those addressed to pay money by subjecting them to the threat and danger of such exposure." And while the notification, etc., sent in the sealed letter is not within the prohibition of the statute, this letter and its threats remove any possible doubt as to what was "calculated" and "obviously intended" by the "warning," etc., or notices in the Tracer, if, indeed, there could have otherwise existed doubt as to such intention. In my judgment, the phrasing of such warning notice, in and of itself, brings the notice within the statute, if it be on the "outside cover or wrapper," as such terms are used in the statute.

The further argument is urged by defendant that the Tracer is to the retail merchant what Dun's and Bradstreet's publications are to the jobber and wholesaler, and that a construction of the statute which would convict defendant would also bring the other publications under the ban of the act. By no means. The publications just named originated from the necessity of the situation, and appear to have become a settled factor in our commercial business methods. The jobber and wholesaler has his place of business at a considerable distance from that of his customers. He is not able, on receipt of an order, to make personal inquiry and investigation as to the local record and financial status of his customer. Dun and Bradstreet have their local reporters in every locality. The jobber refers to the publication by Dun or Bradstreet as to financial liability of the customer, and he may have special inquiry made through the reporter for any change in the situation, judgments rendered, mortgages given, etc. No such necessity exists where retailer and customer are residents in same locality. The published ratings of business men, as given by Dun and Bradstreet, have no similarity to these "warning," etc., notices. The Tracer has a small part of its issue devoted to similar ratings. But they occupy a very small portion of the issue, by far the larger portion being devoted to "accounts for sale" and "warning," etc., notices. Upon the front (outside) page appears only that part of its method which relates to "wanted" and "warning" notices, and its last page is entirely devoted to "accounts for sale." If Dun or Bradstreet, firmly established and widely extended as their systems are, were to print and circulate to their subscribers such "wanted" and

"warning" notices as are quoted above, they would justly be abandoned by their subscribers. The reputable jobbers and wholesale merchants of the country would not tolerate such a system.

This much for the general situation. The special point, whose answer must determine action upon the pending motion, is, is the first (outside) page of the Tracer, in evidence, its "outside cover," within the meaning of the statute? That it comes within the spirit of the statute there can be no doubt. If any of the notices above quoted had been written on a postal card, and sent through the mails, concededly, the postal would have come within the statute. In that case the postal clerk, if he read the notice, must turn to the side opposite the address. In the performance of his ordinary duties, his eye would not fall upon the notice. Yet the statute declares such postal to be nonmailable matter. If to the issue of the Tracer in evidence had been attached a colored page of paper, on which the name, number of issue, etc., of paper had been printed (as on front page in evidence), with any of these quoted notices, it is conceded that such an issue would be nonmailable matter. But in the page in evidence there is afforded to the postal employés equal opportunities to read these notices as in the case just supposed. The evidence shows that the Tracer, after being trimmed, etc., ready for mailing, has its pages about 9 by 12 inches. In the mailing of these papers, where more than one copy is to be sent to the same post office,—and the evidence shows the copy was so sent,—the name of the persons to whom the copies are to be delivered is placed on the front (outside) page. Then the papers for the office are rolled up together in a package, in one wrapper, and on that wrapper is written the name of the post office. When this package reaches such post office, the office employés necessarily tear off this package wrapper, that they may find the names of the persons to whom the papers are to be delivered. And every clerk or carrier attached to that office, through whose hands a copy thus sent has to pass, must look at this front (outside) page to ascertain the name of the addressee. And thus each employé or official is compelled to read that front (outside) page, at least so far as the address thereon, and the "warning" etc., notices thereon fall directly within his sight. If each paper had been wrapped up by itself, and on that wrapper such "warning" notice had been printed, the notice would have been but little, if any, more easily read by the post-office employés than under the present methods of mailing these papers. The "manner and style of display," in the heavy, black-faced titles of the town, are calculated to draw attention of parties interested to the "warning" notices given thereunder. There can be no question that this front (outside) page is within the spirit of the statute, so completely is "the mischief intended to be remedied" by such statute apparent on such page. "Still," quoting again the language of Judge Butler in U. S. v. Dodge, supra, "unless it is covered by the terms of the statute, fairly construed, the defendant cannot be held to have violated it." Nothing in the statute, nor in the evidence introduced, shows that the term "outside cover" is used with any technical meaning. We turn then to its

commonly accepted meaning. The statute uses three terms in this connection: "Envelope, outside cover, or wrapper." Manifestly, this first page (outside) is not an "envelope," as that term is ordinarily used. The "wrapper," as regards this copy, must be construed to mean the package wrapper, as above explained, which, for convenience in mailing, surrounded all the copies sent to the one office, rolled or wrapped together in the one package. Can this front (outside) page properly be said to be the "outside cover" of this paper? Has it any "cover"? Defendant claims it has not. Webster (Unabridged Dictionary) defines the noun "cover": "(1) Anything which is laid, set, or spread upon, about, or above another; an envelope; a lid. (2) Anything which veils or conceals; a screen; disguise; cloak." Worcester defines the noun "cover": "(1) That which is laid over something else; a covering;" and the verb: "(1) To lay or place one thing on or over another so as to protect or screen it; to overspread with something." Webster defines the verb "cover": "To overspread, envelope the surface or whole body; to lay or set over; to enwrap; to enfold." Defendant has submitted copies of different periodicals, and also opinions of different publishers, as to what is, "by the trade," considered a "cover." But these opinions have not a common basis, and do not even convince that there is any "trade" or technical meaning to the term, as applied to periodicals. Using the same liberty which defendant has taken in submitting unsworn opinions, I have, since submission of the motion, presented the question to printers, publishers, and others, and am unable to find that there is any special "trade" meaning or use of the term. Of the periodicals submitted, some have the outside pages of different color from the paper on which the body of the periodical is printed, and bear evidence of being undisputedly "cover" for the periodical. Others have no such different color on outside pages, but have on those pages the title, date, number of volume and issue, and drawings. Such is the copy of the Scientific American introduced; also the copy of Harper's Weekly and Harper's Bazar, Truth, Puck, and Judge. Again, it is said a test may be found in whether such page is consecutively numbered with the pages constituting the body of the paper or periodical. But an examination at any news counter which has a large number of current periodicals will be convincing that such is not a true test. Another test is stated to be whether the front (outside) page is detached in binding, or is bound with the body of the paper, etc. Here the matter of individual taste largely controls. The pages devoted exclusively to advertising in the weekly or monthly publications are generally detached, and not bound into the volume. But an examination of Harper's Weekly, Bazar, Truth, Puck, and various other periodicals or papers, will show that the entire advertisements therein are intended to be, as they generally are, bound into the volume. The test as to whether bound into the volume or not would be a varying test. If we adopt the underlying idea of Webster and Worcester with reference to the noun "cover" as above given, it is that of overspreading, overlaying. If the first and last (or outside) pages overspread or overlay

the other pages, there appears no good reason why these pages may not be regarded as covers. Had the paper of these outside pages been of different color from the inner pages, there might be a more ready concession that they are covers. But no definition or test suggested by defendant includes difference in color as an essential. Since, then, "the mischief to be remedied," which caused the enactment of the statute, is, as to position and ease of inspection, in a more aggravated situation on the front (outside) page of the Tracer than it would have been if printed on the obverse of a postal card; since it is equally open to inspection and reading, and in plain view, in this issue of the Tracer as it would have been if printed on a tinted or colored page; and since, in either case, the tests given would have declared the statute violated,—in what way is violence done to the statute, or injustice to defendant, if we hold this overspreading and overlaying outside page a "cover," within the meaning of the statute which was enacted to remedy the very mischief here apparent?

Defendant has submitted a letter received from the post-office department, since verdict in this case was rendered, in answer to his request as to the meaning of the words "cover or wrapper" in this connection:

In an opinion rendered by Hon. J. N. Tyner, assistant attorney general, post-office department, June 6, 1891, a "cover" is defined as that which overlays or overspreads; and a "wrapper," that in which a thing is inclosed. In accordance with the above, scurrilous matter appearing upon the outside or over-laying portions of mail matter may be considered to be upon the cover thereof.

So that the holding and practice of the department are in substantial compliance with the views above expressed.

Defendant argues that the above views would place within the statute every copy of a newspaper which is sent to the subscribers through the mails, wherein is printed the usual contents of such paper, and that in heated political contests either the press must forego the liberty they now exercise, or the United States courts will be kept lively in convicting the publishers, etc. It is possible that the construction above given to this statute would apply to pamphlets and papers of such size as that the entire page is open to inspection on their removal from the package wrapper. Where the reasoning is applicable—that is, if the spirit of the statute and its letter apply to such a case—the court would be compelled to enforce the statute. But a very small portion, if any, of our newspapers would fall within the statute. I do not apprehend that the courts would experience the difficulty suggested. "The mischief intended to be remedied" by the statute would rarely, if ever, apply to such newspapers. The Interstate Tracer is in no sense a "newspaper," as that term is generally understood. A manifest difference exists between a paper which prints an article as the news of the day, and a paper whose announced purpose is to "trace up and make known" the record of the individuals as to whom "warning" is given in its columns.

U. S. v. Gee, 45 Fed. 194, is cited by defendant as giving a different construction to the statute from that reached herein. In

that case four-page circulars were folded oblong, and postage stamps placed on the circulars themselves. The court sustained the motion of defendant for a verdict for defendant "for the reason that the objectionable language was not upon the outside cover or wrapper of the matter mailed, there being no outside cover or wrapper." The condition in which these circulars were when mailed does not exactly appear, although the reasoning of the court restricts the statute to cases where the objectionable language is exhibited upon "an inclosing wrapper or cover." This limitation makes the word "cover" of little force in the statute. If the obnoxious matter is on the "outside cover," the statute is aimed against its mailing, even though such cover be not an "inclosing wrapper or cover," but overspreads or overlays the pamphlet or paper mailed.

Defendant insists further that he is entitled to mail the Tracer, because the post-office department has decided it to be mailable as second-class matter. And he submits a letter signed by the third assistant postmaster general, and dated March 5, 1889, to the postmaster at Marshalltown:

The Interstate Tracer, published weekly at your place, has been decided by this office, after consideration of the application and papers submitted by the publisher, to be entitled to admission to the mails at the second-class rate of postage.

The evidence does not disclose what papers were submitted with the application of the publishers. On the hearing of this motion in arrest there was submitted to the court a copy of the Tracer, of date Marshalltown, Iowa, November, 1886, which is a very different publication from the issue of the Interstate Tracer in evidence at the trial, and on which the indictment was based. The Tracer contains editorial matter, general news items relating to trade and commerce, and has a cover of tinted paper. Besides, on the first page of the inner pages again appear the title, date, serial number, etc. It contains no "warning" or "wanted" notices, such as are above quoted, although there are a number of pages of "ratings" of individuals, with some columns of "Addresses Wanted," and "Found." If the specimen copy submitted to the post-office department was similar to this copy of November, 1886, the letter authorizing its entry as second-class matter is readily understood. But the announced holding of the department, in the extract above given, of date June, 1891, would unquestionably prevent such order being granted as to the issue of the Interstate Tracer in evidence herein. When and by what steps the Tracer of November, 1886, degenerated into the Interstate Tracer of April, 1896, the evidence does not disclose. But I cannot avoid the conclusion that the steps materially marking this change must have occurred after the decision was made permitting its entry as second-class matter.

In Ex parte Jackson, 96 U. S. 727, the supreme court of the United States affirmed the powers of congress with regard to the statute under consideration:

The power possessed by congress embraces the regulation of the entire postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded.

The same opinion declares, with reference to the "freedom of the press," with which it is claimed the statute under consideration interferes:

Nor can regulations be enforced against the transportation of printed matter in the mail, which is open to examination, so as to interfere in any manner with the freedom of the press. Liberty of circulating is as essential to that freedom as liberty of publishing. Indeed, without the circulation the publication would be of little value. If, therefore, printed matter be excluded from the mails, its transportation in any other way cannot be forbidden by congress.

And Judge Phillips has well said (U. S. v. Harmon, 45 Fed. 414, 416):

It is a radical misconception of the scope of the constitutional protection to indulge the belief that a person may print and publish ad libitum any matter, whatever the substance or language, without accountability to law. Liberty in all its forms and assertions in this country is regulated by law. It is not an unbridled license. Where vituperation or licentiousness begins, the liberty of the press ends.

That eminent jurist, Judge Story, in his commentaries on our constitution, has expressed his views very clearly. We quote a brief extract:

There is a good deal of loose reasoning on the subject of the liberty of the press, as if its inviolability were constitutionally such that, like the king of England, it could do no wrong, and was free from every inquiry, and afforded a perfect sanctuary for every abuse; that, in short, it implied a desperate sovereignty to do every sort of wrong, without the slightest accountability to private or public justice. Such a notion is too extravagant to be held by any sound constitutional lawyer, with regard to the rights and duties belonging to governments generally, or to the state governments in particular. If it were admitted to be correct, it might be justly affirmed that the liberty of the press was incompatible with the permanent existence of any free government.

Congress has enacted this statute. It in no wise affords a person assailed through a paper or pamphlet redress for injuries or damages thereby suffered. The determination of such questions is properly left with the state or other courts, under other and different proceedings. But at the date of the enactment of the present statute there existed an evil against which this statute was expressly aimed. The mails of the country were used for the carriage of scurrilous and defamatory, etc., matter, which was so mailed as to be exposed to the eyes of the employés in the post office department. This was the mischief to remedy which congress legislated. It has not declared that such matter shall not be carried in the mails. Whether such a widespread or flagrant abuse of the mails may be at any time occasioned by mailing of such publications, and when, as that the mails shall be entirely closed to them, is for congress to determine. As this statute now stands, defendant is not liable thereunder, except when, by his method of sending his paper through the mails, he shall so expose the objectionable matter on the "envelope, outside cover or wrapper." The abuse of the mails which brought this statute into existence is clearly apparent. The mischief sought thereby to be remedied exists in the Interstate Tracer in evidence, as mailed by defendant. The defendant has been heretofore sentenced by this

court for violation of this statute by the unlawful use of postal cards in connection with his collection agency. There appears something of intent on his part to move in the prohibited direction as far as he possibly can, and yet escape the penalties of a violated law. As I am compelled to the conclusion that scurrilous and defamatory matter is printed on the outside cover of the paper in evidence, defendant's motion in arrest of judgment must be overruled. Ordered accordingly, and defendant excepts.