**UNITED STATES of America**

v.

**Wilfred HANDLER.**

**Crim. No. K–74–0283.**

United States District Court,
D. Maryland.

Oct. 24, 1974.

George Beall, U. S. Atty., D. Md., James M. Kramon, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Wilfred Handler, defendant pro se.

FRANK A. KAUFMAN, District Judge.

Handler, the defendant in this case, is charged in a thirty-four count indictment with having violated 18 U.S.C. § 1718 [1] by mailing between August 9,

---

1. That statute provides:

All matter otherwise mailable by law, upon the envelope or outside cover or wrapper of which, or any postal card upon which is written or printed or otherwise impressed or apparent any delineation, epithet, term, or language of libelous, scurrilous, defamatory or threatening character, or calculated by the terms or manner or style of display and obviously intended to reflect injuriously upon the character or conduct of another, is nonmailable matter, and shall not be conveyed in the mails nor delivered from any post office nor by any letter carrier, and shall be withdrawn from the mails under such regulations as the Postal Service shall prescribe.

1973 and September 26, 1973 twenty (20) post cards to Mortimer M. Caplin, Esq.[2] and a further fourteen (14) post cards to Arthur J. Goldberg, Esq. In each count, the post card attributed misconduct to the latter, a former member of the Supreme Court of the United States. For example, Count One of the indictment charges that upon one of the post cards mailed to Caplin was written:

> Ex-Justice Arthur J. Goldberg (your "old and close" friend) is a despicable criminal—one of the most dangerous in the United States. I so advised you.

And,

> Your motive, obviously, is to protect your friend, the now proved slimy dangerous criminal Arthur J. Goldberg.

Count Three charges that another post card addressed to Caplin contained writing stating that:

> Arthur J. Goldberg (your recent television guest) is an habitual *repugnant criminal*—one of the most dangerous in the United States. So is his *wife*. Or else, to protect his own reputation for piety, Criminal Ex-Justice Gold-

berg makes it appear that his wife perpetrates certain of his despicable crimes.

(Emphasis in original.) Count Fourteen charges that a post card mailed to "Arthur J. Goldberg" carried the same writing, word for word, as appeared in the post card referred to in Count Three.[3]

Handler, acting *pro se*,[4] has filed a number of motions, including a motion to dismiss the indictment, supported by copies of many papers and extensive memoranda addressed to a variety of factual and legal issues, and has raised pre-trial issues which appear to fall into three groups, two without, and one with, merit.

## I.

Handler seeks to require this Court, before considering any other issue, to turn this case into a trial not only of the government officials prosecuting this case but also of the addressees of his post cards. *Inter alia,* Handler has filed a motion asking this Court to censure the United States Attorney's office, and further seeks to require prosecution un-

---

Whoever knowingly deposits for mailing or delivery, anything declared by this section *to* be nonmailable *matter,* or knowingly takes the same from the mails for the purpose of circulating or disposing of or aiding in the circulation or disposition of the same, shall be fined *not more than* $1,000 or imprisoned not more than one year, or both.

What is now 18 U.S.C. § 1718 has existed without any significant change in language since 1888. See the Act of September 26, 1888, ch. 1039, § 1, 25 Stat. 496. A somewhat similar statute, proscribing "scurrilous epithets" was enacted in 1872, Act of June 8, 1872, ch. 335, § 148, 17 Stat. 302. See n. 9A, *infra.*

Because the statutory offense involved provides a confinement penalty of "not more than one year", the offense is a misdemeanor, 18 U.S.C. § 1, and thus one which may be prosecuted by indictment or information. Fed.R.Crim.P. 7(a). In this case the Government proceeded by way of indictment.

2. Apparently the former Commissioner of Internal Revenue.

3. Additionally, the record would seem to indicate that Handler has mailed cards, containing remarks similar to those quoted in Counts One and Three, to Professors Alexander Bickel and Fred Rodell of the Yale Law School and to Rabbi Bernard Mandelbaum of the Jewish Theological Seminary.

4. The defendant, a law school graduate who states that he has not been admitted to the bar of any state or has ever practiced law, has, at his own insistence, and in accordance with his right so to do, acted at all times without counsel in this case. Over the opposition of the defendant, and upon the Government's motion, the Magistrate of this Court who conducted the preliminary hearing herein, ordered an examination under 18 U.S.C. § 4244. This Court subsequently approved and confirmed that order. Handler was examined by a qualified psychiatrist on May 27, 1974, who rendered his report on June 28, 1974, stating his opinion that Handler was able to understand the instant proceedings and properly to assist in his own defense. This Court agreed and continues so to agree.

der 18 U.S.C. § 241 [5] of those he alleges have violated the law by harassing him by instituting and prosecuting this case. Handler has also in the course of proceedings in this Court charged misconduct not only by one or more government prosecutors, but by one or more members of the office of the Clerk of this Court, by the court reporter, and by this Court. In that latter connection, the undersigned member of this Court has, prior hereto, declined to disqualify himself under 28 U.S.C. § 144.

The record in this case discloses that Handler is the same Handler who was once employed as a financial investigator in the Division of Financial Investigation of the United States Department of Labor and who unsuccessfully sought court relief after he was separated from the Department. Handler v. Secretary of Labor, 126 U.S.App.D.C. 311, 379 F. 2d 88 (1967).

The record in this case also discloses that, dating back to at least 1971, Handler made a number of mailings to and about Arthur J. Goldberg, who was Secretary of Labor before he became a Justice of the Supreme Court. After those mailings were reported to the Government and investigated by it, it appears that an Assistant United States Attorney for the District of Maryland advised Handler that no prosecution would be initiated if Handler ceased the mailings, that Handler so agreed, but thereafter once again made certain mailings. The Government states that it therefore determined to proceed against Handler under 18 U.S.C. § 1718. After a preliminary hearing before Magistrate Clarence E. Goetz of this Court on October 15, 1973, the Magistrate determined the existence of probable cause to believe Han-

dler had violated 18 U.S.C. § 1718. The Government further asserts that Handler thereafter agreed to stop the allegedly objectionable mailings; that the Government in return moved to dismiss the complaint; that that motion was granted by Magistrate Goetz on February 22, 1974; that an Assistant United States Attorney, replying to an inquiry from Handler, informed Handler of that dismissal on April 22, 1974; that on April 23, 1974 Handler recommenced the alleged objectionable mailings; and that on April 30, 1974 Handler was arrested after Magistrate Paul M. Rosenberg of this Court issued an arrest warrant. The indictment in this case was handed down on May 7, 1974.

Handler seemingly does not contest any of those statements by the Government. But he does contend that not only were all mailings by him at any time legal, but that at the very least, all mailings made by him on and after April 23, 1974 were legal and that he is now being prosecuted for mailings before that date simply because he engaged in subsequent mailings. Handler also stresses the refusal of government prosecutors to prosecute those concerning whom he has supplied evidence of crime.

■■ Improper prosecutorial tactics can in a given case rise to such a level as to require dismissal of the case. *See* Dixon v. District of Columbia, 129 U.S. App.D.C. 341, 394 F.2d 966 (1968); *cf.* McDonald v. Musick, 425 F.2d 373 (9th Cir. 1970). As long ago as 1886, dealing with a state prosecution, the Supreme Court wrote:

Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by

---

5. 18 U.S.C. § 241 provides:

If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of anoth-

er, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886). That doctrine has been applied against the federal government as well as against the states. *See* United States v. Falk, 479 F.2d 616 (7th Cir. 1973) (en banc); United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972). It is also true that "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." Oyler v. Boles, 368 U.S. 448, 456, 82 S. Ct. 501, 506, 7 L.Ed.2d 446 (1962). However, " * * * *Oyler* does not preclude the granting of relief against intentional or purposeful discrimination against an individual." United States v. Falk, 479 F.2d *supra* at 619. In *Falk* (at 621), the majority held that the defendant was entitled under the facts of that case to have the Government " * * * accept the burden of proving nondiscriminatory enforcement of the law * * *." In *Falk*, the defendant alleged that he was prosecuted for violation of the card-carrying requirements of the Selective Service Act " * * * to punish him for and stifle his and others' participation in protected First Amendment activities in opposition to the draft and the war in Vietnam" (at 619–620). Over a vigorous dissent, the majority of the en banc Court held that Falk had established his right to a pre-trial evidentiary hearing to determine the issue he posed, and vacated the judgment of conviction. In so doing, after discussing *Oyler* and other authorities including United States v. Crowthers, *supra*, Judge Sprecher noted (456 F.2d at 620–621):

> * * * Certainly, the prospect of government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives in seeking an indictment is to be avoided. That does not mean that a criminal defendant is never to be afforded an opportunity to prove that the prosecution stems from an improper prosecutorial design or that he may never question a prosecutor under oath. The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice. However, when a defendant alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose, we think a different question is raised.

In United States v. Crowthers, *supra,* the Court reversed convictions because it held (456 F.2d *supra* at 1079) that the Government, in connection with the use of the concourse of the Pentagon—

> may not permit public meetings in support of government policy and at the same time forbid public meetings that are opposed to that policy. It may not accomplish its selective objective by convenient labelling: good ones are religious services and bad ones are demonstrations.

Cases such as Dixon v. District of Columbia, *supra,* in which prosecutions have been dismissed because of improper prosecutorial conduct are of a different type than this case. In that case and in McDonald v. Musick, *supra,* the prosecution of charges was reinstituted because the defendants refused to agree not to press or assert contentions or claims of illegal police conduct. In both *McDonald* and *Dixon,* the prosecutors were candidly seeking to protect policemen against civil suits. In this case, Handler is complaining that he is being prosecuted for his pre-agreement mailings, which Handler asserts are legal, because he has made post-agreement mailings which Handler contends are unquestionably legal. Even assuming that Handler's said claims are true, those claims do not facially and conclusively rise to the level

of the selective prosecutorial approach considered in *Crowthers*. Nor do they appear to rise to the level of the claims in *Falk* which caused the majority therein to vacate the judgment of conviction and remand the case for a factual determination—a determination which seemingly is the kind of a pre-trial determination which is to be made by the trial judge and not by the jury. United States v. Berrigan, 482 F.2d 171, 174–176 (3d Cir. 1973); *see* United States v. Robinson, 311 F.Supp. 1063, 1064 (W.D. Mo.1969). Additionally, it would not appear that this case falls into the ambit of governmental violation of an agreement with a defendant or a potential defendant. *See* Walters v. Harris, 460 F. 2d 988, 991 et seq., 995 (4th Cir. 1972); United States v. Carter, 454 F.2d 426, 427–429 (4th Cir. 1972). In any event, the constitutional questions posed by Handler's claim that the within prosecution is aimed at preventing his present exercise of his First Amendment rights, regardless of whether his pre-agreement mailings were or were not permitted by law, are, when viewed in the light most favorable to Handler, no less serious than those this Court faces herein under III *infra*. Accordingly, it would hardly make sense for this Court to hold an evidentiary hearing on the retaliation issue, before considering the issue posed under III *infra*, even if such a hearing would be required by Handler's charges and the current state of the record in this case. Thus, this Court will not determine herein whether Handler's claims climb to the level of that rare case in which such an evidentiary hearing is required—a level which it is hard precisely to locate as the differing views expressed by the majority and dissenting opinions in *Falk* disclose.

## II.

■■ There is however a statutory construction issue raised by Handler's motion to dismiss which this Court is required to resolve before reaching *any*

constitutional question raised by Handler herein. That issue revolves around the meaning of the words *"post card"* as used in each count of the indictment, and the words *"postal card"* and "outside cover" as those words appear in section 1718.[6] Handler's position adds up to the proposition that *"postal card"* are words of art which must be narrowly construed particularly since criminal sanctions are involved. But even a statute providing criminal penalties must not be read in a manner which violates common sense. In United States v. Campos-Serrano, 404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971), Mr. Justice Stewart, quoting in part from United States v. Bramblett, 348 U. S. 503, 510, 75 S.Ct. 504, 99 L.Ed. 594 (1955), noted:

> The canon of strict construction of criminal statutes, of course, "does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature." * * *

And in United States v. Cook, 384 U.S. 257, 262–263, 86 S.Ct. 1412, 1414, 16 L. Ed.2d 516 (1966), Mr. Justice White wrote:

> We are mindful of the maxim that penal statutes should be strictly construed. But that canon "is not an inexorable command to override common sense and evident statutory purpose," * * * and does not "require that the act be given the 'narrowest meaning.' It is sufficient if the words are given their fair meaning in accord with the evident intent of Congress." * * * [Citations omitted.]

Citing and relying upon *Cook*, Judge Field, in United States v. Williams, 485 F.2d 1383, 1384 (4th Cir. 1973), observed:

> While it is true that criminal statutes are to be strictly construed and that ambiguities are to be resolved in favor of the defendant, statutes are not to be construed in a manner which

6. See n. 1, *supra*.

would defeat their clear purpose. United States v. Cook, 384 U.S. 257, 262, 86 S.Ct. 1412, 16 L.Ed. 516 (1966).

Handler, in support of his position, points to statutory provisions which until rather recently were codified as 39 U.S.C. § 4251(b) and (c) and which provided:

(b) A postal card is a card supplied by the Department with a postage stamp printed or impressed on it for the transmission of messages, orders, notices and other communications, either printed or written in pencil or ink.

(c) Post cards are privately printed mailing cards for the transmission of messages. They may not be larger than the size fixed by the Convention of the Universal Postal Union in effect and of approximately the same form, quality and weight as postal cards.

Those sections dealt with rates, sizes of items and the like and were repealed by the Postal Reorganization Act of 1970.[7] In general, without including either definition, those former statutes were replaced by 39 U.S.C. § 3623 which relates to mail classification and delegates to the Postal Rate Commission and to the Postal Service the duty to study and to promulgate new classification schedules. In any event, the purposes of former section 4251(b) and (c) were far different from those of section 1718. With regard to that section, we must look to the meaning of the words used therein in the context of that statute and of its purposes.

The predecessor of section 1718,[8] enacted in 1872, was a broad statute designed to prevent the mailing of any material, the outside of which had exposed upon it obscene,[9] libelous or scurrilous language.[10] Thus, in Warren v. United States, 183 F. 718, 721 (8th Cir. 1910), the Court described a predecessor to section 1718 as "forbidding the deposit in the mails of anything upon the exposed surface of which appears language scurrilous, defamatory, or threatening, or calculating and obviously intended to reflect injuriously upon the character or conduct of others."

The present statute, i. e., 18 U.S.C. § 1718, with its use of the words "[a]ll matter * * * written or printed or otherwise impressed or apparent" indicates its own sweeping character. Many though not all of the early cases interpreting what is now section 1718 have read that statute broadly so as to include all items sent through the mails. It is true, however, that the precise question raised by Handler has not been explicitly considered in any opinion known to this Court. Indeed, no case decided to date comments one way or the other upon the distinction Handler urges. In Cherry v. Postmaster General, 272 F.Supp. 982 (D.P.R.1967), aff'd without opinion (1st Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1809, 20 L.Ed.2d 653 (1968), the Postmaster General's determination of nonmailability under section 1718 of items which were *"post cards"*, using those words in the narrow

---

7. Act of August 12, 1970, Pub.L.No.91–375, 84 Stat. 719.

8. See n. 1, *supra.*

9. In 1948 the provision dealing with obscenity was split off and placed in 18 U.S.C. § 1463. Tollett v. United States, 485 F.2d 1087, 1089 n. 5 (8th Cir. 1973).

10. Act of June 8, 1972, ch. 335, § 148, 17 Stat. 302, read as follows:

That no obscene book, pamphlet, picture, print, or other publication of a vulgar or indecent character, or any letter upon the envelope of which, or postal card upon which scurrilous epithets may have been written or printed, or disloyal devices printed or engraved, shall be carried in the mail; and any person who shall knowingly deposit, or cause to be deposited, for mailing or for delivery, any such obscene publication, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall, for every such offence, be fined not more than five hundred dollars, or imprisoned not more than one year, or both, according to the circumstances and aggravation of the offence.

context Handler urges, was upheld without any such distinction being mentioned. And in Tollett v. United States, 485 F.2d 1085 (8th Cir. 1973), discussed at length in III *infra*, in a lengthy opinion holding section 1718 unconstitutional,[11] Judge Lay referred to the mailings as "post-cards" and seemingly used that term synonymously with the words "postal cards". Similarly, in McKnight v. United States, 78 F. 2d 931 (9th Cir. 1935), the Court treated what appear to have been "post cards" as if they were within the ambit of 1718.[12]

It should also be noted that to distinguish between "post cards" and "postal cards" for purposes of section 1718 would not seem to accord with the relevant statutory chronology. The use of "postal cards" appears to have first been authorized by statute in 1872.[13] In the same Act, in an earlier section,[14] Congress, in passing the first predecessor of section 1718, included envelopes and postal cards. In 1888,[15] those portions

of the 1872 statute proscribing certain mailings were amended into essentially the current form of section 1718.[16] It was not until 1898, however, that post cards or private mailing cards, as distinguished from postal cards which are printed and sold by the Government, were authorized to be accepted into the mails.[17] That 1898 legislation was entitled "An Act To amend the postal laws relating to use of *postal* cards" (emphasis supplied) and authorized what have become known as "post cards" but which were described in the 1898 statute as "private mailing cards". Thus, the Congress, when it first enacted legislation in 1898 permitting the mailing of what were described as "post cards" in former 39 U.S.C. § 4251(c),[18] used in the title of the act the words "postal cards" to encompass "private mailing cards", *i. e.*, post cards.[19]

Perhaps most important of all, current modern usage treats the words "postal cards" and "post cards" almost interchangeably. For example, the RAN-

11. No petition for certiorari review was filed in *Tollett*.

12. For other cases dealing with cards and section 1718, see Griffin v. United States, 248 F. 6 (1st Cir. 1918) ; United States v. Smith, 69 F. 971 (D.Minn.1895) ; United States v. Elliot, 51 F. 807 (D.Ky.1892) ; United States v. Bayle, 40 F. 664 (E.D.Mo. 1889) ; United States v. Davis, 38 F. 326 (W.D.Tenn.1889).

13. Act of June 8, 1872, ch. 335, § 170, 17 Stat. 304.

14. Section 148, 17 Stat. 302. See n. 10, *supra*.

15. Act of September 26, 1888, ch. 1039, § 1, 25 Stat. 496.

16. See n. 1, *supra*.

17. Act of May 19, 1898, ch. 347, 30 Stat. 419, which read as follows :
    An Act To amend the postal laws relating to use of postal cards.
    *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That from and after the first day of July, eighteen hundred and ninety-eight, it shall be lawful to transmit by mail, at the postage

rate of a cent apiece, payable by stamps to be affixed by the sender, and under such regulations as the Postmaster-General may prescribe, written messages on private mailing cards, such cards to be sent openly in the mails, to be no larger than the size fixed by the convention of the Universal Postal Union, and to be approximately of the same form, quality, and weight as the stamped postal card now in general use in the United States.

18. That statutory provision is set forth at p. 11, *supra*.

19. In any event, regardless of the meaning of the words "postal card" as used in section 1718, it may be that the words "outside cover", as they are used therein, are sufficiently broad to include both sides of a post card. See the cases dealing with mailings of newspapers containing allegedly objectionable words on their outside pages. *Compare* United States v. Burnell, 75 F. 824 (S.D. Iowa 1896), distinguishing (at 830–831) United States v. Gee, 45 F. 194 (W.D.Mich. 1890), and holding the mailing covered by the statute, *with* United States v. Higgins, 194 F. 539 (W.D.Ky.1912), rejecting the *Burnell* approach in favor of that set forth in *Gee*.

DOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1966) includes the following definitions:

> *Postal card 1* A card sold by the post office with a stamp, already printed on it, usually mailable at a rate lower than that for letters in envelopes. *2* See *post card* (def. 1).
>
> \*   \*   \*   \*   \*   \*
>
> *Post card 1* Also called *picture post card,* a small, commercially printed card, usually having a picture on one side, to which a postage stamp must be attached for mailing. *2* See *postal card* (def. 1). Also, *post card.*

(Emphases in original.) Similarly, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (unabridged) (1967) defines:

> postal card n: POSTCARD
>
> \*   \*   \*   \*   \*   \*
>
> postcard: a card for bearing a message through the mail without an envelope: a (1): a card to which an adhesive stamp must be affixed (2): such a card having a decoration (as a picture) on one side b: a card bearing a government-imprinted stamp or official reply-paid indicia

And the NEW ROGET'S THESAURUS OF THE ENGLISH LANGUAGE (1961) includes the following entry:

> post card, *n.*   card, postal card, postal (EPISTLE)

To sum it up, it is hard to believe that anyone reading section 1718 could believe that the Congress intended to permit a person such as Handler to purchase at a place other than a post office a card, to lick and place a stamp upon it, to write as he pleased upon it, to deposit it in the mail, and to evade the coverage of the statute which would exist if he wrote the same message upon a card which he purchased at a post office with a stamp printed upon it, or which would exist if he wrote that message upon the back of an envelope, put a stamp on the front thereof, and placed it in the mail.

## III.

■ There remains the issue of whether 18 U.S.C. § 1718 is unconstitutional both because it violates protected First Amendment rights without sufficient justification and also because it is substantially overbroad. If it is, then the indictment in this case must be dismissed since the statute on which it is based is invalid.

The constitutionality of section 1718 was recently considered by the Eighth Circuit in the case of Tollett v. United States, 485 F.2d 1087 (8th Cir. 1973). In a scholarly, well-reasoned opinion, Judge Lay found section 1718 to be "substantially overbroad" [20] and therefore unconstitutional. This Court agrees with the *Tollett* decision on the issue of overbreadth and also finds section 1718 unconstitutional on the independent ground that the statute unnecessarily restricts protected First Amendment expression. [21]

At the threshold, before considering the question of constitutionality *vel non* of section 1718, the question arises as to what test that statute must meet, that is, whether the statute raises a "true free speech" issue or whether no such issue is posed because the First Amendment does not cover material committed to the mail. In a line of cases beginning with Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877 (1877), and Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092 (1904), the Supreme Court developed the so-called "privilege doctrine" with relation to the use of the mail, writing in *Jackson* (96 U.S. at 732, 24 L.Ed. 877) that:

> The power possessed by Congress embraces the regulation of the entire

---

20. *Tollett,* the leading case on this issue, was not initially cited by Handler, but was, even before it was mentioned by this Court, cited by government counsel.

21. Handler, as a person alleging that his own First Amendment rights are unnecessarily restricted by section 1718 has standing to raise that issue. However, as Judge Lay specifically held in *Tollett* (at 1088–1089), he also has standing to challenge the statute as overly broad since the alleged overbreadth is "substantial".

postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded. * * *

But that privilege doctrine, under attack for more than fifty years, would, as Judge Lay concluded in *Tollett* (at 1090–1091), rather clearly appear to be no longer good law. In a footnote in his opinion concurring in part and dissenting in part in Roth v. United States, 354 U.S. 476, 505 n. 5, 77 S.Ct. 1304, 1319, 1 L.Ed.2d 1498 (1957), Mr. Justice Harlan commented:

> The hoary dogma of Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877 and Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092, that the use of the mails is a privilege on which the Government may impose such conditions as it chooses, has long since evaporated. * * *

Previously, dissenting in United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921), Mr. Justice Holmes had written:

> The United States may give up the postoffice when it sees fit; but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . .

More than forty years later, Mr. Justice Douglas, writing for the majority in Lamont v. Postmaster General, 381 U.S. 301, 305, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), quoted that Holmes statement with approval. In Hiett v. United States, 415 F.2d 664, 666–669 (5th Cir. 1969), the Fifth Circuit, in the course of holding 18 U.S.C. § 1714, which prohibits use of the United States mails with regard to information pertaining to foreign divorces, violative of the First Amendment, specifically rejected the "privilege doctrine." So did Judge Lay in *Tollett*. This Court concurs in the views of the Fifth and Eighth Circuits in *Hiett* and *Tollett* and finds itself unable to adopt the contrary approach of the Tenth Circuit in McCrossen v. United States, 339 F.2d 810 (10th Cir. 1965), and of the District Court in Cherry v. Postmaster General, 272 F.Supp. 982 (D.P.R.1967), aff'd without opinion (1st Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1809, 20 L.Ed.2d 653 (1968), for the reasons set forth in *Tollett* (485 F.2d at 1098 n. 27, 1090–1091), by Judge Lay. Thus, "the prohibitions of § 1718 must be construed in the light of the First Amendment rather than in the light of any regulatory power granted to the Postal Service." *Tollett* at 1091.

The Government has argued, however, that traditional First Amendment analysis is not appropriate in this case since the statute leaves the defendant free to express precisely the same sentiments by simply enclosing them in an envelope. In effect, this is an argument that section 1718 regulates only "the time, the place, and the manner" of the defendant's speech and not the speech itself. Healy v. James, 408 U.S. 169, 192, 92 S. Ct. 2338, 33 L.Ed.2d 266 (1972); *see* the discussion in *Tollett*, 485 F.2d at 1091; *see also* Adderley v. Florida, 385 U.S. 39, 47–48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Essentially this would seem to be the theory on which the Tenth Circuit upheld the constitutionality of section 1718 in McCrossen v. United States, *supra*.

But as the Court in *Tollett* pointed out (485 F.2d at 1091), the words "time, place and manner" are not a magical rubric before which the protections of the First Amendment vanish; and in Konigsberg v. State Bar, 366 U.S. 36, 50–51, 81 S.Ct. 997, 6 L. Ed.2d 105 (1961), Mr. Justice Harlan observed that for a "time, place and manner" test to be applicable the statute in question must meet two tests. First, it "must not be intended to control the content of the speech", *Tollett*, 485 F.2d at 1091, that is, it must be one of the class of what Mr. Justice Harlan in *Konigsberg* (366 U.S. at 50, 81 S.Ct. 997) characterized as "general regulato-

ry statutes." Second, it "must be necessary to further a significant governmental interest." *Tollett*, 485 F.2d at 1091.[22] It is clear that this statute does not meet the first of the *Konigsberg* tests. It does not take a neutral, regulatory position toward the exposure of non-address writing on envelopes and post cards by banning all such writing regardless of content (indeed, to do so in the case of post cards would be to regulate them out of existence). Instead it requires the Postal Service to select from the enormous volume of mail passing through its hands that mail containing language that is "libelous, scurrilous, defamatory or threatening" and to withhold that mail from its addressees regardless of whether those addressees desire to receive that mail. Obviously such a procedure is fraught with all of the dangers that attend any statute giving discretionary censorial power over speech to the Government. *See* Rowan v. Post Office, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

■ The Supreme Court has rejected the view that First Amendment rights to free speech are "absolutes". *Konigsberg, supra,* 366 U.S. at 49, 81 S.Ct. 997; Chaplinsky v. New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Nevertheless, the standard that a statute must meet in First Amendment cases is very high. It has been held "that it is an essential prerequisite to the validity of an investigation that intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a sub-

ject of overriding and compelling state interest." Gibson v. Florida Investigation Committee, 372 U.S. 539, 546, 83 S.Ct. 889, 894, 9 L.Ed.2d 929 (1963). Even if the statute were a general regulatory one, without reference to content, it has been suggested that the "compelling interest" test would be appropriate. Lamont v. Postmaster General, 381 U.S. 301, 308–309, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring). *See also* NAACP v. Button, 371 U.S. 415, 438–439, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

■ A review of the case law indicates that there are at least several possible compelling governmental interests which section 1718 may be designed to protect. To begin with, the statute's probable historical purpose was that it be a sort of postal criminal libel statute.[23] While the Supreme Court in Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), in a 5–4 decision upheld a state's power to punish group libel, this Court agrees with the *Tollett* Court that "a strong argument may be made that there remains little constitutional vitality to criminal libel law." 485 F.2d at 1094. This is particularly true of criminal libel laws that could be used to avoid the rules as to the libel of public officials and others, enunciated by New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. *See Tollett*, 485 F.2d at 1097. Garrison v. Louisiana, 379 U.S. 64, 67, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), specifically held that criminal libel of a public official did come within the *Sullivan* rule and therefore could only be punished if it were a

**22.** It may be that, as suggested in *Tollett* at 1091, n. 8, it is also necessary to add a third requirement of what might be called "good fit". Even if the Government has a "legitimate" purpose "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). Thus, a legitimate "time, place and manner" statute must be "narrowly drawn to meet the supposed evil."

Cantwell v. Connecticut, 310 U.S. 296, 306–307 (1940); Louisiana v. NAACP, 366 U.S. 293, 297, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961). *See* the discussion of the overbreadth of section 1718, *infra*.

**23.** Indeed, the "Historical and Revision Notes" set forth in the current publication of the U. S. Code state that the offense provided therein "is essentially criminal libel * * *."

false statement made with actual malice. And in Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966), the Supreme Court reversed a Kentucky conviction on a charge of common law libel, even though the Kentucky Supreme Court had held that the necessary elements of the crime included the publication with malice of a defamatory statement which was false. *Ashton* at 198, 86 S.Ct. 1407. Even if *Beauharnais* still remains good law today, it is at least questionable whether that case stands as authority to uphold a criminal libel statute such as section 1718. Furthermore, simply identifying the statute as a criminal libel statute does not provide it with a purpose. And even if criminal libel statutes are constitutional in general, in any given case a court is required to weigh the purposes furthered by the particular statute against the particular restraints placed by that statute on expression, before that statute may be held to be constitutionally valid.

The two major concerns that have underlain criminal libel laws have been "the private right to enjoy integrity of reputation" and "the public right to tranquillity". Beauharnais v. Illinois, 343 U.S. *supra* at 294, 72 S.Ct. 725, 750 (Jackson, J., dissenting). With respect to the latter, "it can hardly be urged that the maintenance of peace requires a [public] prosecution for private defamation." [24] With regard to the former, it is quite difficult to see what additional purpose a criminal prosecution for libel might serve beyond that supplied by the civil remedy for defamation, except (1) to circumvent the restrictions placed on civil libel litigation by *Sullivan* and by its progeny—a result which *Garrison* has foreclosed, or (2) to punish an indigent who could not be reached by a civil judgment for damages. The first is clearly an impermissible attempt to circumvent the First Amendment; the second, while not as obviously invalid as the first, raises quite serious problems of equal protection as well as the First Amendment ones. In any event, such a purpose behind a criminal libel statute, *i.e.*, to deter potential libellers who would not be frightened of a judgment but who would be frightened and deterred by the possibility of imprisonment for criminal libel, while it might possibly meet a "rational basis" test, hardly rises to the level necessary to meet the "compelling interest" test applicable in cases involving restrictions on First Amendment protected speech. Therefore, even if criminal libel statutes as a class do remain constitutional, section 1718 cannot be justified simply on the basis that it is such a statute.

A second possible purpose of section 1718 is the need to protect those exposed to the material in question, in this case, the postal employees.[25] The short answer is "that the postal employees' job is to deliver the mail and not to read it. They are in no way forced to read the language on envelopes or postcards other than to determine the addresses. Thus, any concern the government has with protecting the inadvertent viewer is insubstantial." *Tollett*, 485 F.2d at 1092.

A third possible interest is the addressee's interest in being left alone—in stopping what might be a campaign of harassment directed against him, his friends or his family through the abuse of the mails. In such a campaign, post cards would be a very effective weapon, since their impact could not be avoided by throwing them away unopened and the addressee's family and children would be exposed to them. The Supreme Court in Rowan v. Post Office, 397 U.S. 728, 90 S.Ct. 1484 (1970), up-

---

24. Brennan, J., writing in *Garrison*, 379 U.S. *supra* at 69, 85 S.Ct. at 213 and quoting from T. Emerson, "Toward a General Theory of the First Amendment," 72 Yale L.J. 877, 924 (1963). *See* Judge Lay's discussion in *Tollett*, 485 F.2d at 1094–1095.

25. *Tollett*, 485 F.2d at 1092; *see* United States v. Anderson, 268 F. 696, 697 (D. Mont.1920). *See also* Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), discussed at some length in *Tollett*, 485 F.2d at 1092–1093.

held the constitutionality of a statute [26] which enabled an addressee to require the Postmaster General to stop delivering any mail to the addressee's home from a named mailer and to require that that mailer delete the addressee's name from any mailing lists it may maintain. However, unlike the statute in *Rowan*, section 1718 is not sufficiently responsive and confined to the protection of the interest involved. The statute in *Rowan* protected the addressee's peace of mind by permitting him "in his sole discretion" to decide what is "erotically arousing or provocative" [27] and then to require the Postal Service to order the sender to refrain from making further mailings from that sender to the addressee. In his opinion in Rowan, Mr. Chief Justice Burger (at 732–733, 90 S. Ct. 1484) emphasized that the legislative history of the statute intentionally eliminated the Postal Service from any censorship function. Noting the absolute right of a citizen to exclude mail from his own home, the Chief Justice wrote (at 737, 90 S.Ct. 1484) that the "Congress provided this sweeping power not only to protect privacy but to avoid possible constitutional questions that might arise from vesting the power to make any discretionary evaluation of the material in a governmental official."

In the case of section 1718 the constitutional question which was avoided in *Rowan* arises with particular force since the statute appears to assign the deter-

mination of nonmailability solely to the Postal Service without providing any other standards than the words of the text of the statute itself. The case law on the statute makes this assignment even clearer.[28] Like the statute in Lamont v. Postmaster General, 381 U.S. *supra* at 306, 85 S.Ct. 1493 at 1496, section 1718 "sets administrative officials astride the flow of mail to inspect it, appraise it, . . . " [29] and, in effect, to censor it. Like the statute in *Lamont*, this one must be held unconstitutional. It may be that an act modelled after the one in *Rowan* which dealt only with material that the *addressee* has determined to be "libelous, scurrilous . . ." would be constitutional. But section 1718 is not that statute and that question need not be reached herein since it is not before this Court. Thus, even if protection from harassment is assumed to be a sufficient justification to support the proper statute, it cannot be used to justify section 1718.

Finally, it should be noted that, although section 1718 and its predecessors have been in force for over one hundred years, there is very little case law on how it should be construed. While there are some cases that appear to indicate an attempt to narrow the statute to make it fit within the confines of the First Amendment,[30] there have been at least as many cases giving it a very broad reading.[31] In any event, it cannot be said that section 1718 comes before

---

26. 39 U.S.C. § 4009, now 39 U.S.C. § 3008.

27. 39 U.S.C. § 4009(a), (b), now 39 U.S.C. § 3008(a), (b).

28. *See, e. g.*, Shoemaker v. Burke, 67 App.D. C. 281, 92 F.2d 205, 207 (1937) ("the authority to pass upon such a subject is in the first instance intrusted by statute to the Postmaster General, and . . . his decision thereon is conclusive unless he has exceeded his authority or the court should be of the opinion that his action was clearly wrong").

29. That language is quoted by Mr. Chief Justice Burger in *Rowan* at 397 U.S. 735 n. 4, 90 S.Ct. at 1489.

30. *See, e. g.*, McKnight v. United States, 78 F.2d 931 (9th Cir. 1935) ; American Civil

Liberties Union v. Kiely, 40 F.2d 451 (2d Cir. 1930). *See also* United States v. Higgins, 194 F. 539 (W.D.Ky.1912) ; United States v. Gee, 45 F. 194 (W.D.Mich.1890). *But cf.* United States v. Burnell, 75 F. 824 (S.D.Iowa 1896). See also the discussion under II, *supra*, particularly at p. 15 n. 18.

31. Indeed, the Court in *Tollett*, 485 F.2d at 1089 refers to the "bizarre facts" in some of those decisions. Examples include Stevens v. Summerfield, 151 F.Supp. 343 (D.D.C. 1957), aff'd, 103 U.S.App.D.C. 201, 257 F.2d 205 (1958) (writing on the outside of an envelope was held to reflect injuriously on the Postmaster General because it attacked the legend "In God We Trust" printed on the postage stamp affixed to the envelope) ; Shoemaker v. Burke, 92 F.2d 205, 206 (D.C.

this Court with its language substantially narrowed or limited by judicial construction.

In sum, since section 1718 infringes upon the fundamental interest in free speech that is guaranteed by the First Amendment and since it is not justified by any fundamental governmental interest sufficiently compelling to outweigh that interest, it is unconstitutional and no indictment based on it can stand.

Furthermore, that same conclusion is impelled by an entirely distinct approach. Even if some compelling state interest were found to support section 1718, it still would be unconstitutional because its language is substantially overbroad.[32]

As the Eighth Circuit said in *Tollett*:

We conclude that § 1718, as it relates to libelous and defamatory statements, is similarly unconstitutional because of its substantial overbreadth: The Act does not in any way attempt an objective definition of "libelous" and "defamatory";[33] there exists no statutory language limiting the application of the present penal statute to private libel in contrast to libel relating to public officials, public figures or public affairs; there is no clarification within the statute as to whether Congress intended truth to be a defense to any defamation or, if so whether truth would still be punishable unless coupled with good motives; there is no clarification in the Act as to whether Congress deemed it necessary that "malice" be an element of the offense for either private or public libels; there is no clarification as to whether libel must be knowingly falsely made or may be "negligently" made; there is no clarification as to whether the libelous or defamatory statements must necessarily lead to an immediate breach of peace and, if so, there is no narrow approach as to the meaning of "breach of peace" encompassed by the statute. * * * [485 F.2d 1097 (footnotes omitted).]

Thus, as the Supreme Court has said:

[E]ven though the governmental purpose be legitimate and substantial,

Cir. 1937) (in which the Court wrote that the words "I don't read Hearst" exposed on an envelope were "a purely gratuitous intrusion of opinion by the writer denunciatory in its nature of Hearst and the Hearst publications * * * * [and] was obviously intended to reflect injuriously upon t e character and conduct of another, * * *") ; United States v. Simmons, 61 F. 640 (D. Conn.1894) (holding that postal cards were non-mailable because they contained such allegations as "You have promised, but do not perform", and "I see, very plainly, you do not intend to pay any attention to my letters, or your agreements"). The word "threatening" in section 1718 has been held to prohibit the following language: "[s]uit enters unless you act promptly." United States v. Prendergast, 237 F. 410 (D.Or. 1916). It is true that many of those decisions only involved determinations by the Postmaster General that the material was non-mailable and did not involve criminal sanctions. Nevertheless, since criminal sanctions may follow if material is mailed and

subsequently is determined to have been non-mailable, those definitions of non-mailability must be viewed together with the criminal sanctions imposed by section 1718.

32. However, the statute would not seem to be vague under the test set forth by Mr. Justice Powell in Smith v. Goguen, 415 U.S. 566, 572–573, 94 S.Ct. 1242, 1247, 39 L.Ed. 2d 605 (1974), *i.e.*, "notions of fair notice or warning" to defendants and "reasonably clear guidelines for law enforcement officials and triers of fact". However, section 1718 is void for vagueness as that term is used in *Tollett*, 485 F.2d at 1096 n. 22: " * * * We use 'vagueness,' however, in the sense that it is 'wholly merged with the overbreadth doctrine when statutes covering first amendment activities are at issue.' Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 873 (1970). * * *"

33. The Louisiana statute struck down in *Garrison* did contain a definition of defamation. Garrison v. Louisiana, 379 U.S. 64, 65 n. 1, 85 S.Ct. 209 (1964).

that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (footnotes omitted).[34] Further, as the Supreme Court wrote in Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) concerning another statute, 18 U.S.C. § 1718 is unconstitutionally overbroad because is sweeps within its ambit "a great variety of conduct under a general and indefinite characterization, * * * leaving to the executive and judicial branches too wide a discretion in its application."

The pinch caused by the result reached in a case such as this was well and aptly put by Mr. Justice Harlan in Cohen v. California, 403 U.S. 15, 91 S. Ct. 1780 (1971). Therein, Mr. Justice Harlan, after noting (at 22, 91 S.Ct. at 1787) that " * * * * the issue flushed by this case stands out in bold relief * * * [i.e.] whether California can excise, as 'offensive conduct,' one particular scurrilous epithet from the public discourse," wrote (at 24, 91 S.Ct. at 1787):

The constitutional right of free expression is powerful medicine * * *.

But the distastefulness of that medicine in this or any other case cannot save section 1718 for the reasons set forth in this opinion. Accordingly, defendant's motion to dismiss the indictment must be, and it is hereby, granted.

---

34. That quotation is also relied upon in *Tollett*, 485 F.2d at 1098. And see Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 859 (1970):

The office of a void for overbreadth holding is to induce the legislative body to articulate statutory burdens in terms of non-expressive features of conduct which justify intervention in the great run of cases, thus minimizing disincentives to activity that is privileged because both expressive and insufficiently harmful. * * *