—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered October 18, 1977, convicting him of conspiracy in the third degree, criminal solicitation in the second degree and bribing a witness (three counts), upon his plea of guilty, and imposing sentence. Judgment affirmed. No opinion. Suozzi, Shapiro and Cohalan, JJ., concur; Titone, J. P., dissents and votes to remand the case for a hearing and hold the appeal in abeyance, with the following memorandum: In my opinion, the pretrial moving papers on defendant’s motion to dismiss the indictment, which motion was denied, and the Special Prosecutor’s answer in opposition, raise issues of fact with regard to the 14-month delay between defendant’s initial arrest and the return of the indictment and alleged prosecutorial misconduct, which should be fully explored at a hearing. The record reveals that in the summer of 1975, defendant and the long-established firm in Brooklyn dealing in processed meats in which he was a principal, were targets of an investigation conducted by the Special Prosecutor probing corruption in nursing homes in this State. The thrust of the *914 investigation was to ascertain whether defendant was involved in a kickback scheme with respect to the purchase of meat by such enterprises. In August of that year, the Special Prosecutor’s office persuaded one Jack Kipnis, a wholesale meat dealer in Brooklyn, to wear a tape recorder for the purpose of recording any subsequent conversations he would have with defendant and codefendant Murray Hochhauser. Kipnis was also purportedly "served” with two Grand Jury subpoenas by the Special Prosecutor, the first directing his appearance before that body on August 29, 1975 and the other, requiring him to appear on September 8, 1975. Kipnis proceeded to have a series of recorded conversations with defendant and Hochhauser commencing August 27, 1975 and concluding September 4, 1975. On September 8, 1975, four days after the last recorded conversation, at about 2:00 p.m., defendant was arrested on the street by detectives from the Special Prosecutor’s office. According to the affidavit of defendant’s attorney, Frederick Block, who represented him on the indictment, defendant, at the time of his arrest, was handcuffed, read his rights and held incommunicado until about 9:30 p.m. that evening. He was "made” to listen to the tape recording of the September 4, 1975 meeting he had with Kipnis and Hochhauser and was repeatedly told that unless he co-operated and agreed to be wired as Kipnis was, he would be prosecuted and receive a heavy jail sentence. It is also alleged in Block’s affidavit that defendant was allowed to see his then lawyer (Gregory Perrin) at about 9:30 p.m. and, after the interrogation, was permitted to go home about 11:00 p.m. In an opposing affirmation Frank Connors, a Special Assistant Attorney-General assigned, to the Special Prosecutor’s office, although not denying that defendant was taken into custody in the early afternoon of September 8, 1975 and released 11:00 p.m. that night, contended that defendant was not "made” to listen to the tape recordings that day, but that his then attorney asked that his client be given an opportunity to listen to them. The decision to release defendant and "void” the arrest, according to Connors, was made in response to the request of Perrin for additional time to review the situation. In reply to Connors’ affirmation, Perrin stated that he arrived at the Special Prosecutor’s office at about 6:00 p.m. in response to a call from someone at that office. At his request, he heard the tape in question and also had it replayed for his client. He denied asking for time to review the situation and, contrary to Connors’ contention, stated that at about 11:00 p.m., the prosecutor offered, without any request by Perrin, to allow the defendant to go home. The prosecutor did indicate that the case would be presented to the Grand Jury. On November 12, 1976, more than 14 months after his arrest, defendant was indicted for conspiracy in the third degree (Penal Law, § 105.05), criminal solicitation in the second degree (Penal Law, § 100.05) and three counts of bribing a witness (Penal Law, § 215.00). The Special Prosecutor justifies the 14-month delay between the aborted or "voided” arrest and the indictment on the grounds, inter alia, that (1) defendant was not arraigned at the time and the "voided” arrest remained as an encouragement for him to co-operate, (2) defendant was well aware that he would not stand accused if he co-operated and the Special Prosecutor repeatedly offered him immunity in return for that co-operation and (3) there was an ongoing confidential investigation of the nursing home industry. Any announcement of an indictment based upon undercover operations would have alerted the closely knit nursing home community to the possibility that other co-operative witnesses may have recorded criminal overtures, as indeed they had. With respect to the assertion that the 14-month delay wasv caused in part by the possibility that defendant might co-operate with the *915 subject investigation, I believe a question of fact has been raised requiring a hearing as to whether, by their actions or promises, the defendant or his attorney reasonably induced the Special Prosecutor’s office to believe that such a possibility existed. The mere fact that members of the Special Prosecutor’s staff may have repeatedly offered immunity to defendant during that period in return for his co-operation and that such offers were refused, would not, in my opinion, justify the lengthy delay now before this court. Moreover, I disagree with the Special Prosecutor’s contention that only a formal accusation and arraignment and not merely a simple arrest, actuates the constitutional speedy trial protections. As clearly and cogently stated by the Court of Appeals in People v Staley (41 NY2d 789, 791, 793), once an arrest has been made, the criminal proceeding is deemed to have started and defendant is entitled, constitutionally, to a speedy trial (Dillingham v United States, 423 US 64, 65). In this instance, defendant’s arrest and the nine-hour detention thereunder, established him as an accused. The playing of tape recordings which purportedly demonstrated that he was a participant in a kickback scheme, provided amply evidence of his guilt. The "voiding” of the arrest designed for the purposes of allowing the prosecutor to make additional efforts to have the defendant co-operate in the investigation did not dilute or vitiate the impact or effect of the initial arrest (cf. People v Staley, supra, p 793). Furthermore, the Special Prosecutor’s claim that the "ongoing investigation” of the nursing home industry necessitated the delay in indicting defendant should also be accorded great scrutiny at a hearing. The right to a speedy trial, being a personal one, should not be routinely compromised simply because similar investigations are being conducted into matters that are unrelated to the accused. Unless exigent circumstances, because of the industry-wide investigation, are shown to have existed warranting the 14-month delay herein, I would be extremely loath to accept the Special Prosecutor’s conclusory argument that an indictment of the defendant shortly after the initial arrest would have jeopardized the entire investigation. In addition, assuming it was necessary to ascertain whether defendant was more deeply involved in alleged corrupt activity visa-vis the nursing home industry, in my opinion the Special Prosecutor has the burden of showing why it took 14 months for his office to conduct such additional investigation. The mere fact that records of the police department or assertions of a prosecutor indicate a continuing investigation of criminal activity in a particular field is not sufficient. In such circumstances a hearing must be held to determine whether the preindictment delay was reasonable (see People v Townsend, 38 AD2d 569; cf. People v Washington, 43 NY2d 772). I am also of the opinion that at the hearing the trier of the facts should delve into the actions of the Special Prosecutor’s office during the nine hours defendant was detained after he was arrested on September 8, 1975, and also into the actions prior to the preindictment arrest. It is true that defendant’s version of some of the events that transpired during the nine-hour period vary from the version of Perrin, his then attorney. Specifically, I refer to defendant’s contention that he was "made” to listen to the tape recording, whereas Perrin stated that he requested that it be played for him and his client. However, defendant’s additional assertions that on September 8, 1975 he was arrested, handcuffed and held incommunicado for a number of hours and also threatened that he would be prosecuted and receive a heavy jail sentence unless he co-operated and agreed to be wired for sound, should be on any hearing agenda. In this regard it should he noted that under subdivision 4 of section 135.60 of the Penal Law, a person is guilty of coercion in the second degree when, inter alia: "he compels or *916 induces a person to engage in conduct which the latter has a legal right to abstain from engaging in * * * by means of instilling in him a fear that, if the demand is not complied with, that actor or another will: * * * 4. Accuse some person of a crime or cause criminal charges to be instituted against him” (emphasis supplied). In effect, defendant, by his allegations that he was threatened with being prosecuted unless he went out wired at the instance of the Special Prosecutor, is charging the Special Prosecutor’s office and some of its officers with attempted coercion in the second degree. I confess to being disturbed by matter appearing in the record, and not mentioned by either party, with respect to purported actions of individuals in the Special Prosecutor’s office leading to defendant’s arrest on September 8, 1975. According to the record, the Special Prosecutor’s office issued two Grand Jury subpoenas directing Jack Kipnis to appear before that body with his books, records, invoices, etc. Armed with these instruments, Kipnis, at the behest of the Special Prosecutor’s office, accosted defendant and codefendant Hochhauser and engaged or importuned them into conversations which incriminated them. The record also suggests that Kipnis never appeared before the Grand Jury pursuant to either instrument, but that they were issued solely to aid Kipnis in placing defendant and Hochhauser in a criminally vulnerable position. Thus, I believe a question of fact has also been raised as to whether in issuing such instruments, certain officers of the Special Prosecutor’s office were guilty not only of the improper use of process, i.e., abuse of process (see Pagliarulo v Pagliarulo, 30 AD2d 840), but also of violating section 175.40 of the Penal Law, entitled "Issuing a false certificate”, which provides: "A person is guilty of issuing a false certificate when, being a public servant authorized by law to make or issue official certificates or other official written instruments, and with intent to defraud, deceive or injure another person, he issues such an instrument, or makes the same with intent that it be issued, knowing that it contains a false statement or false information.” (Emphasis supplied.) In sum, defendant has raised issues of fact as to the propriety of the Special Prosecutor’s actions in obtaining the indictment which, if true, might justify dismissal of that instrument. Improper prosecutorial tactics in a given case can rise to such a level as to require dismissal of the case (United States v Handler, 383 F Supp 1267). Thus, for the above reasons, I vote to hold the appeal in abeyance and remand the case for a hearing at Criminal Term.